| | | |
|---|---|---|
| KELVIN FORD and TASHA FORD | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 2:16-cv-02414-JPM-tmp |
| SPECIALIZED LOAN SERVICING, L.L.C., | ) | |
| *et. al.* | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM OF LAW SUPPORTING SUMMARY JUDGMENT

Defendants JPMorgan Chase Bank, N.A. ("Chase") and Specialized Loan Servicing, L.L.C. ("SLS") (collectively, "Defendants") respectfully file this memorandum of facts and law.

## PRELIMINARY STATEMENT

In 1999, Tasha Ford was conveyed the subject property pursuant to a Warranty Deed. On August 12, 2003, Tasha Ford executed a promissory note ("Note") in the amount of $168,550.00 in favor of Chase Manhattan Mortgage Corporation. As security for the loan, Tasha Ford, along with Kelvin Ford, signed a Deed of Trust ("DOT"), secured by real property.[1]

As an initial matter, Kelvin Ford is not a party to the Warranty Deed. He has no interest under the Note, and has only a survivorship interest under the terms of the Deed of Trust. Accordingly, he has no standing to raise the bulk of the claims in the Complaint.[2] As for Mrs. Ford, at her deposition, she was unable to articulate any facts supporting her claims, relying exclusively on Mr. Ford's statements. Likewise, she was unable to articulate any damages.[3]

---

[1] See Statement of Material Facts ("SMF"), ¶1-3.

[2] See *Coleman v. Indymac Venture*, LLC, 966 F. Supp. 2d 759, 770 (W.D. Tenn. 2013) ("Coleman's action of co-signing the [deed of trust] does not vest him of the same rights that the borrower/debtor has under the agreement.").

[3] See Haltom Declaration, attaching a copy of Tasha Ford's deposition, pg. 112, L. 11 to pg. 114, L. 23 (no facts supporting cause of action) and pg. 115, L. 17 to pg. 122 (no damages).

As for their claims, the Fords assert that Chase breached the DOT by referring Mrs. Ford's loan to foreclosure, despite allegedly making all required payments. However, undisputed facts contradict this claim. The DOT required the Fords to make monthly payments that included "Escrow Items." In 2013, 2014, and 2015, Chase adjusted the payments to reflect increases and decreases in taxes and insurance, and provided notice to the Fords of these adjusted payments. The Fords simply ignored these notices—and dozens and dozens of repeated warnings of default from Chase—for two and a half years, continuing to make incorrect payments of $1,280.12, even though their monthly payments had increased because of escrow changes. This is a default under the DOT. Eventually, the Fords fell several full payments behind, and Chase—as the DOT provides—accelerated the account and referred the loan to foreclosure.

The Fords also claim that Chase and SLS breached the DOT by failing to provide required notice. This too is contradicted by undisputed facts. Chase provided numerous acceleration warnings consistent with the DOT. A foreclosure sale was ultimately scheduled for June 2, 2016, and multiple notices of the sale was provided to the Fords by Chase and Defendant Shapiro & Ingle ("S&I"). After the foreclosure sale was scheduled, servicing of Mrs. Ford's loan was transferred to SLS in April 2016. The foreclosure sale then occurred as scheduled on June 2, 2016, consistent with the notice provided by Chase and S&I.[4] Accordingly, summary judgment should be granted in favor of Defendants on both the breach of contract claim and the declaratory judgment claims.

---

[4] The Fords have unsuccessfully attempted similar allegations against multiple other lenders and creditors. See *Ford v. Seterus Inc.*, Shelby Cty. Ch. Ct. No. CH-15-0032-3 (Jun. 28, 2016) (awarding summary judgment on claims for lack of notice and RESPA violation) (Ex. C to Mot. to Dismiss); *Ford v. FedEx Employees Credit Assoc.*, CH-15-1260 (denying motion to stay foreclosure) (Ex. D to Mot. to Dismiss); *Southwind Residential Props. Assoc. v. Ford*, Tenn. Circuit Ct. No. CT-003095-13 (Jun. 20, 2017) (affirming attorneys' fees against Mr. Ford).

The Fords also claim that Chase and SLS failed to properly respond to qualified written requests or "QWRs" under RESPA. Summary judgment should be granted in favor of Defendants on this claim as well, because Chase timely responded to the only letter mailed to it, no letters were mailed to SLS, and letters or faxes to the Substitute Trustee do not constitute QWRs *to the servicer* within the meaning of RESPA.

## PROCEDURAL HISTORY

The procedural history is not straightforward. This Court granted in part Plaintiffs' second Motion to Amend (ECF No. 91). Plaintiffs then failed to timely file their Second Amended Complaint, so the Court reinstated Defendants' Motions to Dismiss the First Amended Complaint. (ECF No. 104). Accordingly, the current operative complaint is Plaintiffs' First Amended Complaint ("FAC") (ECF No. 18). As a result, Defendants' Motions to Dismiss the FAC (ECF Nos. 30, 32, 33, 35) are pending, along with the Court's ruling on the Magistrate Judge's previously issued Report and Recommendation (ECF No. 78).

When considering the (never-filed) Second Amended Complaint, the Magistrate Judge recommended that only the following claims survive: breach of contract (Count I), violation of the Real Estate Settlement Practices Act ("RESPA") (Count IV), and declaratory judgment (Count VII). (ECF No. 78). Because that determination was based on the proposed Second Amended Complaint, Defendants incorporate all arguments from their motions to dismiss herein. As to the claims the Magistrate Judge indicated could survive, Defendants provide the following argument and undisputed facts demonstrating entitlement to judgment as a matter of law.[5]

---

[5] Defendants reserve the right to move for summary judgment with respect to any claims for which the Magistrate Judge recommended dismissal, in the event this Court determines that any additional claims should have survived.

# ARGUMENT

## I.     Legal Standard.

"Summary judgment is an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *FDIC v. Jeff Miller Stables*, 573 F.3d 289, 294 (6th Cir. 2009). Fed R. Civ. P. 56(a) provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive summary judgment, the nonmoving party must present "concrete evidence supporting its claims and establishing the existence of a genuine issue of fact." *Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir. 1989). As such, the non-movant must identify specific evidence in the record that would be sufficient to justify a jury decision in its favor. *See* Fed. R. Civ. P. 56(c)(1).

## II.     Summary Judgment Should be Granted on the Breach of Contract Claim Because Plaintiffs Were in Default and All Notices Were Provided.

"[T]he basic elements of a breach of contract case under Tennessee law must include (1) the existence of a contract, (2) breach of the contract, and (3) damages which flow from the breach." *Life Care Centers of Am., Inc. v. Charles Town Associates Ltd. P'ship*, 79 F.3d 496, 514 (6th Cir. 1996). The Fords' breach of contract claim has two alternative components.[6] First, they claim that Chase breached the Deed of Trust by initiating foreclosure, based on the conclusory allegation that the Fords were not in default.[7] FAC ¶35. Second, they claim that "untimely and improper notice provided by Chase" constitutes a breach of the Deed of Trust, and that SLS failed to provide the notices required by the Deed of Trust. FAC ¶36.

---

[6] The Magistrate Judge has already found that the Fords failed to state a claim for breach of contract based on a purportedly defective appointment of substitute trustee. (ECF No. 78).

[7] The Fords do not explicitly plead any breach of contract claim against SLS based on moving forward with the foreclosure, but it would fail for the same reasons stated with respect to Chase.

## A. The Fords Were in Default.

The DOT provides that "Borrower and Lender covenant and agree as follows:… Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note.  <u>Borrower shall also pay funds for Escrow Items pursuant to Section 3</u>."[8]  SM ¶4. DOT Section 3 provides that the Borrower "shall pay on the day Periodic Payments are due":

> to provide for payment of amounts due for: (a) taxes and assessments. . . ; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums…These items are called 'Escrow Items.'

SMF ¶5. The same provision states: "Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. . . . Any such waiver may only be in writing." *Id.* The DOT defines 'Periodic Payment' as "the regularly scheduled amount due for (i) principal and interest under the Note, <u>plus</u> (ii) any amounts under Section 3 of this Security Instrument." SMF ¶6.

The Note similarly provides: "If I do not pay the full amount of each monthly payment on the date it is due, I will be in default."  SMF ¶7.  DOT Section 3 also explains the process by which the Lender determines the funds owed for Escrow Items:  "Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law." SMF ¶8.  "If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage." *Id.*

---

[8] 15 U.S.C. § 1639d(f)(2) permits a lender to require an escrow account "at [its] discretion, as provided by the contract between the lender or servicer and the borrower."

Consistent with this contractual provision and 12 U.S.C. § 2609, in each year from 2012-2015, Chase provided an Annual Escrow Disclosure Statements setting out its estimates of the amounts due for escrow based on anticipated tax and insurance charges, and any resulting adjustments to monthly payments. SMF ¶9. The relevant monthly payments are as follows:

- May 1, 2012: $1,280.12, reduced from the prior payment amount of $1,315.63.
- May 1, 2013: $1,330.90
- May 1, 2014: $1,512.11.
- May 1, 2015: $1,446.41, reduced from the prior payment amount of $1,446.41. SMF ¶10.

Notwithstanding these notices, from May 1, 2013 through the end of 2015, the Fords continued to make payments to Chase of $1,280.12 per month, instead of the amount adjusted for escrow. SMF ¶11. Chase sent repeated correspondence to the Fords, warning them that payments were falling behind and that the loan may be accelerated. SMF ¶12. Yet, the Fords continued to pay $1,280.12 per month, instead of the amount adjusted for escrow, and made no attempt to make up the loan's past due balance. SMF ¶13. Once a default occurred, Chase was entitled to accelerate the loan and initiate foreclosure. SMF ¶18. On April 14, 2015, Chase sent a letter with the subject line: "Your mortgage payment is past due and your property may be referred to foreclosure." SMF ¶19. The letter states that the amount needed to bring the account current is $5,696.52 and Chase "intends to cause a foreclosure action to be commenced." *Id.*

In response, the Fords sent letters to Chase and S&I claiming that the foreclosure was improper. SMF ¶14. However, the Fords readily admitted they FAILED to paid the full amount due for escrow each month. SMF ¶15. ("[W]e have not missed a single payment of the princip[al], interest and <u>most of the escrow</u>."). It is therefore undisputed that the Fords were in default. *See Turner v. Wells Fargo Bank, N.A.*, No. CIV.A. H-13-808, 2014 WL 3535343, at *3 (S.D. Tex. July 16, 2014) ("Plaintiff subsequently failed to make payments that included the full amounts owed for escrow items. Accordingly, Plaintiff was in default.").

Moreover, the complaints about the escrow adjustments do not excuse their default. First, the DOT explicitly provides that "[n]o offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument." SMF ¶ 16. That is, even *if* a dispute over the amount of escrow were well-founded, the Fords were not entitled to withhold any portion of monthly payments during the pendency of any dispute. *See Hanas v. Seterus, Inc.*, 92 F. Supp. 3d 747, 753 (E.D. Tenn. 2015) ("The failure to make escrow payments as required by the express terms of the Deed of Trust results in a deficiency."). Moreover, the annual adjustments made by Chase are consistent with 12 U.S.C. § 2609, which caps the amount that a lender can require for escrow at the amount necessary to pay reasonably anticipated charges plus:

> such amount as is necessary to maintain an additional balance in such escrow account not to exceed one-sixth of the estimated total amount of such taxes, insurance premiums and other charges . . during the ensuing twelve-month period:

12 U.S.C. § 2609(a)(2) (italics in original). [9]   The Escrow Account Disclosure Statements that Chase sent to the Fords restate the statute in plain language:

> "There needs to be enough money in your escrow account to pay your property taxes and/or insurance. To do that, federal law allows us to require that you keep a minimum balance in your account. This cash reserve helps to cover any increase in taxes and/or insurance. Subject to state law limits, your minimum balance normally equals the amount of your escrow payments for about two months."

*See* SMF ¶ 17. In sum, Chase was entitled to require, in addition to the pro-rated costs of estimated taxes and insurance, and additional two month "cushion" in the escrow account. The Fords were simply not entitled to withhold payment regardless of the underlying merits of their escrow dispute, but the dispute is meritless at any rate.

---

[9] Chase complied with this statute; however, even if the Fords rely upon it, there is no private right of action under 12 U.S.C. § 2609. *See McAnaney v. Astoria Fin. Corp.*, 357 F. Supp. 2d 578, 590 (E.D.N.Y. 2005).

After responding to Mrs. Ford's May 23, 2015 letter (as further discussed below), and offering two pre-approved loan modification offers, which Mrs. Ford did not accept, Chase again referred the loan to foreclosure. On September 29, 2015, Chase sent an Acceleration Warning, showing a past due balance of $10,880.30. SMF ¶25. On November 5, 2015, S&I mailed Notices of Sale, via first class and certified mail, to the Fords. SMF ¶26.

On December 10, 2015, the Fords sent S&I correspondence and a check for $1,244.35, purportedly to correct the current $494.05 escrow shortage, in addition to three previously-returned checks for $1,280.19. SMF ¶27. Those four checks totaled $5,084.92, more than $10,000 short of the amount necessary to reinstate the loan.[10] The Fords readily admit that they never attempted to pay the entire amount due under the loan. SMF ¶43, 44, and 53.

Once the loan has been accelerated—as this one was—up until a certain point before the foreclosure sale, the DOT permits the Borrower to avoid foreclosure if she, among other things "(a) pays Lender all sums which then would be due under this Security Instrument and Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; and (c) pays all expenses incurred in enforcing this Security Instrument." DOT § 19; SMF ¶31. The attempted December 2015 payments to S&I were not sufficient to bring the loan current, let alone reinstate it. *Asemota v. Suntrust Mortg., Inc.*, No. 11-2816-STA-DKV, 2012 WL 12550260, at *7 (W.D. Tenn. June 18, 2012) (rejecting breach of contract claim and holding that where payments did not include payments for Escrow Items, defendant was entitled to reject payments).

---

[10] This was $5,000 less than the amount shown as past due as of September 29, 2015, *see* SMF ¶25, and did not account for the payments due in intervening months. As context, on December 16, 2015, Chase sent Mrs. Ford a reinstatement quote showing that the total amount due to reinstate the loan was $16,782.97. SMF ¶34.

In short, pursuant to the explicit terms of the DOT, the Fords' failure to make a complete monthly payment for Escrow Items constituted a default, that default was never cured, and Chase was entitled to exercise the power of sale as a result. Chase did not breach the DOT by referring the loan to foreclosure, nor did it or SLS breach the DOT by moving forward with foreclosure in 2016. Chase and SLS are therefore entitled to judgment as a matter of law as to this portion of the breach of contract claim.

### B. Chase Provided All Required Notices.

The Fords also claim that Chase breached the DOT due to an unspecified "untimely and improper notice," FAC ¶ 36. DOT Section 22 provides:

> Lender shall give notice to borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument . . . . The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property…
> If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full or all sums secured by this Security Instrument without further demand and may invoke the power of sale… If Lender invokes the power of sale, Trustee shall give notice of sale…and Lender or Trustee shall mail a copy of the notice of sale to Borrower…Trustee, without demand on Borrower, shall sell the Property….

SMF ¶29.[11] Between July 2013 and April 2015, Chase sent Mrs. Ford more than 33 notices stating that payments were past due, including at least 20 "Acceleration Warning" letters. SMF ¶ 12. All "Acceleration Warning" documents sent to both Mr. and Mrs. Ford stated: (1) the loan was in default, (2) the amount past due, (3) the action required to cure default, (4) notice that if

---

[11] Similarly, DOT Paragraph 20 requires that, before a party "commences . . . any judicial action," that party must notify the other party in order to allow a reasonable period for that party to take "corrective action." SMF ¶29. The same provision, however, states that "[t]he notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 . . . shall be deemed to satisfy the notice and opportunity to take corrective action provisions." *Id.* Also, in Tennessee, foreclosure is not a "judicial action"; the power of sale is a private contractual remedy. *See CitiMortgage v. Drake*, 410 S.W.3d 797, 804 (Tenn. Ct. App. 2013).

default was not cured, "Chase may accelerate the maturity of the Loan, declare all sums secured by the Security Instrument immediately due and payable, and commence foreclosure proceedings, all without further notice to you," and (5) notice of right to reinstate after acceleration. SMF ¶31.

The Fords failed to cure the default and Chase then invoked the power of sale. SMF ¶32. On September 29, 2015 Chase sent an Acceleration Warning, which included the same language set forward above. SMF ¶25. S&I mailed Notices of Sale, via first class and certified mail, to the Fords on November 5, 2015, listing a sale date of December 17, 2015 at 10:00am. SMF ¶26 and 33. This Notice also stated that the public auction would occur at the Comfort Inn Downtown, 100 N. Front Street, Memphis, TN 38103. SMF ¶33. This mail was returned unclaimed, but the Notice of Sale was duly published, and the publication listed the same auction location. SMF ¶33. The Fords produced a copy in discovery, evidencing receipt by U.S. mail.

The Fords most certainly had notice of the December 17, 2015 sale date, because on December 10, 2015, Mr. Ford sent S&I a letter requesting that foreclosure proceedings cease. SMF ¶27. The December 17, 2015 sale was postponed until January 28, 2016, and S&I mailed the Fords notice of the postponement. SMF ¶35. After that date, the sale was rescheduled several times, and S&I provided a notice of postponement each time. SMF ¶36.

On April 13, 2016, S&I sent both Mr. and Mrs. Ford a letter stating that the sale had been rescheduled for June 2, 2016 at 10:00am. SMF ¶38. Similarly, on April 14, Chase sent the Fords a letter stating that the sale was rescheduled for June 2, 2016. *Id.* The foreclosure sale in fact occurred on that date, at the location set forward in the notice and publication, at the Comfort Inn Downtown. SMF ¶59; FAC ¶ 25. It therefore cannot be disputed that (1) Chase provided all necessary pre-acceleration notices and (2) S&I, as required by the Deed of Trust, mailed the

Notice of Sale to the borrowers in November 2015 and all notices of postponement thereafter. As such, the Fords cannot establish any breach of the Deed of Trust.

Even if the Fords have shown any breach, their breach of contract claim fails because they are unable to adduce any evidence of damages caused by any purported lack of notice. Indeed, the Fords admit that they had actual notice of the sale. FAC ¶¶ 24-26; *see Peoples v. Bank of Am.*, No. 11-2863-STA, 2012 WL 601777, at *5 (W.D. Tenn. Feb. 22, 2012).[12]

### C. SLS Provided all Required Notices.

The Fords claim that SLS breached the Deed of Trust by "failing to provide the notices required by the DOT and regulated by Tenn. Code Ann. § 35-5-101." FAC ¶ 36. As an initial matter, Tenn. Code Ann. § 35-5-101(f)'s notice provision provides that "the trustee or other party that sells the property shall send" notice to the debtor. *Id.* (emphasis added) SLS is not the trustee and is not independently subject to this statute. Thus, the only potentially viable claim pertains to the DOT. As set forward above, Section 22 provides that after the Lender has provided notice of default and an opportunity to cure,

> "[i]f the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full or all sums secured by this Security Instrument without further demand and may invoke the power of sale… If Lender invokes the power of sale, Trustee shall give notice of sale . . . and Lender or Trustee shall mail a copy of the notice of sale to Borrower. . . ."

SMF ¶ 28. The history of S&I and Chase's notices to the Fords—which complied with the Deed of Trust—is set out above. Nonetheless, the Fords apparently take the position that once the loan's servicing was transferred to SLS, they were entitled to some renewed notice of sale as a

---

[12] *See also Shirley v. NationStar Mortg., LLC*, No. 2:10-CV-144, 2011 WL 1196787, at *2 (E.D. Tenn. Mar. 29, 2011) ("Clearly, the plaintiff has received some notice of the foreclosure sale, for he filed this suit to enjoin such sale."). As such, they cannot establish the necessary damages element of a breach of contract claim, either. *See McCord v. Goldman Sachs Mortg. Corp.*, No. 3:12-CV-1191, 2014 WL 1317653, at *8 (M.D. Tenn. Mar. 27, 2014) ("[I]t is undisputed that the plaintiffs were aware of the foreclosure sale before it took place. Moreover, it is undisputed that, even if the notice requirements were fully complied with, the plaintiffs would not have paid).

result of the transfer. Nothing in Paragraph 22 requires a new servicer to provide a successive notice of acceleration when the previous servicer has already provided that notice. At the time the servicing was transferred to SLS, Chase had already exercised the power of sale pursuant to the terms of Paragraph 22, and the foreclosure sale was already scheduled.

Moreover, the Fords have failed to adduce evidence of any damages caused by SLS's purported failure to provide any *additional* notice of acceleration after it began servicing the loan effective April 16, 2016.[13] The Fords admit that a foreclosure sale was originally scheduled for April 21, 2016, just a few days after SLS assumed servicing duties. FAC ¶ 22. Just before the servicing transfer, both Chase and S&I had mailed notices stating that sale was postponed until June 2. SMF ¶38. Notwithstanding, on April 24, 2016, SLS provided Tasha Ford with a summary of the balances due. SMF ¶40. Mrs. Ford was admittedly aware of the foreclosure and did nothing to pay the amounts due. SMF ¶43. Mr. Ford was aware of the June 2 sale and did not attempt to pay the amounts due. SMF ¶44.

The Fords cannot plausibly claim that they were unaware that their account had been accelerated or that foreclosure proceedings were ongoing: indeed, they filed their original Complaint the very same day as the re-scheduled sale was to take place. *See, e.g.*, *Peoples*, 2012 WL 601777, at *5 (rejecting claim for non-compliance with statutory notice provisions). Both SLS and Chase are entitled to judgment as a matter of law on the Fords' breach of contract claims, because there is no genuine dispute notice was provided pursuant to the DOT.

### III.     Summary Judgment Should Be Granted on the RESPA Claim

RESPA requires mortgage loan servicers to timely and adequately respond to a qualified written request ("QWR") from a *borrower* for information relating to the servicing of a loan. 12

---

[13] Notwithstanding Chase's notice that the servicing of the loan would be transferred, the Fords continued to send payments to Chase. SMF ¶42. Chase forwarded the payments to SLS on May 3 and June 2, 2016. *Id.*

U.S.C. § 2605(e)-(f).  A QWR is written correspondence that includes the name and account number of the borrower and a statement of the reasons the borrower believes the account is in error or an explanation of other information sought by the borrower.  § 2605(e)(1)(B).  Not every written correspondence to a servicer triggers RESPA's response provisions.  A servicer is only required to respond to a borrower pursuant to RESPA if: "(1) the servicer receives a QWR; and (2) the written correspondence meets the statutory definition of a QWR."  *Griffin*, *supra*, *citing Moody v. CitiMortgage, Inc.*, 32 F. Supp. 3d 869, 873 (W.D. Mich. 2014).

### A. Plaintiffs' Correspondences to Defendants Are Not Qualified Written Requests and Do Not Trigger Defendants' Duties Under RESPA

Two regulatory provisions, 12 C.F.R. §§ 1024.35(c) and 1024.36(b), provide the framework for QWRs.  "Section 1024.35(c) governs QWRs by borrowers seeking to assert errors with their mortgage and § 1024.36(b) governs QWRs by borrowers seeking information on their mortgage."  *Best v. Ocwen Loan Servicing, LLC*, 2016 WL 125875, at *2 (E.D. Mich. 2016).  Both provisions allow a servicer to "establish an address that the borrower *must use*" to request information or submit a notice of error ("NOE").[14]  12 C.F.R. §§ 1024.35(c), 1024.36(b) (emphasis added).  The "must use" language was included in sections 1024.35(c) and 1024.36(b) in June 2014, to replace 24 C.F.R. § 3500.21(e)(1) (also known as "Regulation X"), which courts had interpreted as imposing an affirmative obligation on a borrower to use the address designated by a servicer for receipt of QWRs as a prerequisite to triggering RESPA obligations.[15]

---

[14] A notice of error is defined as "any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the . . . account, and the error the borrower believes has occurred."  *Id.* § 1024.35(a).  Section 1024.35 does not expressly authorize a private right of action.  *See Miller v. HSBC Bank U.S.A., N.A.*, No. 13 CIV. 7500, 2015 WL 585589, at *10-11 (S.D.N.Y. Feb. 11, 2015).  Even if it did, however, the Fords' RESPA pleading deficiencies would extend to notices of error in addition to qualified written requests. *See generally id.*

[15] *See, e.g.*, *Steele v. Green Tree Servicing, LLC*, No. 3:09-CV-0603-D, 2010 WL 3565415, at *3 (N.D. Tex. Sept. 7, 2010), *aff'd sub nom. Steele v. Green Tree Servicing, L.L.C.*, 453 F. App'x

Plaintiffs claim that they "made repeated inquiries with Chase, SLS and SAI concerning the allocation and application of their escrow account and misapplication of funds," that "[s]aid inquiries constitute NOEs and QWRs as set forth in RESPA," and that Chase and SLS failed to respond. FAC ¶¶ 60-61. From what Defendants can glean from Plaintiffs' ambiguous allegations, there are only four pieces of correspondence that could possibly form the basis of Plaintiffs' § 2605 claim: (1) a letter dated May 23, 2015; (2) a letter dated December 10, 2015; (3) a fax dated January 26, 2016; and (4) a fax dated May 31, 2016. As will be more fully set forth herein, none of these are QWRs and as such, Plaintiffs' RESPA claims fail.

### 1. May 23, 2015 Letter

On or about May 23, 2015, Tasha Ford sent a letter to Chase to "dispute the default status, to request that you stop foreclosure proceedings immediately and clean up my account within thirty days." SMF ¶47. The letter is addressed to "Chase Home Finance, Attn: Research Department, P.O. Box 24696, Columbus, OH 43224-4696." *Id.* Chase Customer Request Management received the letter on May 29, 2015. *Id.*

A servicer is permitted to establish an exclusive address for the receipt of QWRs and/or NOEs, so long as (1) written notice is provided to the borrower that indicates such correspondence must be sent to the designated address, and (2) the servicer posts the designated

473 (5th Cir. 2011) (holding that the defendant "had no duty under RESPA to respond to [the plaintiff's] letters" because it had "established an exclusive location at which it would accept qualified written requests, and [the plaintiffs] never sent a proper request to that address"); *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1149 (10th Cir. 2013) (finding that the plaintiff's inquiries were not QWRs because "[r]eceipt at the designated address is necessary to trigger RESPA duties, and [the defendant] did not receive [the plaintiff's] inquiries at the designated address"); *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 182 (2d Cir. 2014) (relying on *Berneike* to conclude that "[a]s long as a servicer complies with the notice requirements of [§ 3500.21(e)(1)] for designating a QWR address, a letter sent to a different address is not a QWR."). In effect, sections 1024.35(c) and 1024.36(b) "changed what was once a permissive requirement to one that was mandatory; if a loan servicer designated an address to receive QWRs, then a borrow 'must use' that address and no others." *Basora v. JPMorgan Chase Bank*, 202 F. Supp. 3d 1328 (S.D. Fla. 2016).

address on its website. 12 C.F.R. §§ 1024.35(c), 1024.36(b). When a servicer fulfills these statutory requirements, the borrower must use the servicer's designated address to claim the protection of RESPA; failure to do so is a complete bar to relief.[16]

Chase sent the Fords mortgage assistance information letters monthly between July 2013 and October 2014. SMF ¶45. Each time, this correspondence included a statement that the mortgage payment was in default, and also included the following provision:

> You can send us a Notice of Error, Information Request or Qualified Written Request as part of the Real Estate Settlement Procedures Act to ask for information or to dispute errors about the servicing of your mortgage loan. …
> To do so, send us a separate letter that describes the issue and include any supporting documents. Please mail it to our exclusive address for the receipt and handling of these requests:
> Mail: Chase
>        P.O. Box 183166
>        Columbus, OH 43218-3166

*Id.* Chase's website likewise includes this same information and exclusive address. *Id.* ¶46.

The adequacy of this precise notice was approved in *Basora v. JPMorgan Chase Bank*. *See* 202 F. Supp. 3d 1328 (S.D. Fla. 2016). In that case, the plaintiff argued that the language Chase used was "more of an invitation to use the designated address [rather] than a command" and therefore did not satisfy 12 C.F.R. § 1024.35(c). *Id.* at *3. The court rejected this argument, holding that Chase's use of the word "exclusive" "clearly indicated to borrowers that all QWRs must be sent to the address designated in its notice." *Id.* Because the plaintiff failed "to send his correspondence to the designated address," his correspondence was not a QWR and never triggered Chase's response duties under RESPA. *Id.*

---

[16] *See, e.g.*, *Griffin*, *supra*, No. 14-CV-2335-JTF-TMP, 2015 WL 12532144, at *4 ("[A] loan servicer's obligation to respond to a QWR is only triggered if the QWR is sent to the servicer's designated address for receiving QWRs."); *Childress v. CitiMortgage, Inc.*, No. CIV. 08-1137 MCA/RHS, 2010 WL 9951758, at *11 (D.N.M. Feb. 19, 2010) ("[T]he . . . letter did not trigger Defendant's RESPA obligations because Plaintiff received adequate notice of the designated and exclusive address for qualified written requests, but yet failed to send the letter to that address.").

Here, Chase sent the Fords multiple notices that provided an "exclusive address for the receipt and handling" of NOEs, information requests, and QWRs.  SMF ¶45-46.   The Fords have not disputed the adequacy of this notice nor the fact that they failed to send the May 23, 2015 letter to the proper address.  As a result of the Fords' failure to send the May 23, 2015 letter to the exclusive address designated by Chase, the letter is not a QWR and/or NOE under RESPA and Chase had no duty to statutory duty to respond (though it did, as set forward below).

2.  Letter dated December 10, 2015

The next potential RESPA allegations involves a letter sent by Kelvin Ford to S&I at 10130 Perimeter Parkway, Suite 400, Charlotte, NC 28216 on December 10, 2015.  SMF ¶52. The letter indicates that the Fords "dispute part of the debt and the default status" and request all foreclosure proceedings "cease and desist . . . immediately."  *Id.*  Like the May 23, 2015 letter, this letter is not a QWR and cannot form the basis of a RESPA claim against Defendants.

Like the May 23, 2015 letter, this correspondence was not sent to the designated address. Indeed, the December 10, 2015 letter was not sent to Chase at all: it was addressed to S&I, who is not the servicer of the mortgage and not the proper recipient of QWR correspondence.[17]  For these reasons, the December 10, 2015 letter is not a QWR and does not trigger RESPA.[18]

3.  Faxes dated January 26, 2016 and May 31, 2016

Finally, Kelvin Ford sent two faxes to S&I at 10130 Perimeter Parkway, Suite 400, Charlotte, NC 28216, dated January 26, 2016 and May 31, 2016.  SMF ¶55.  Like the inquiries

---

[17] *See Bally v. Homeside Lending, Inc.*, No. 02 C 5799, 2005 WL 2250856, at *3 (N.D. Ill. Sept. 8, 2005) (granting lender's motion for summary judgment where the plaintiff "failed to create a triable issue of fact that she properly sent [QWRs] to the defendant" by mailing letters to a law firm involved in the foreclosure litigation and allegedly faxing copies to the lender).

[18] On December 16, 2015, Chase sent a letter enclosing the payment history for the loan, and another letter enclosing a reinstatement quote showing that the total amount due to reinstate the loan was $16,782.97.  SMF ¶53. In addition, on December 30, 2015, Chase sent a letter detailing the corporate advance balance. SMF ¶54.

previously discussed, these faxes do not qualify as QWRs within the meaning of RESPA.

Again, there is no serious dispute that, by sending the faxes to an address in North Carolina, Plaintiffs failed to use Chase's exclusive address for RESPA inquiries in Ohio. Furthermore, Plaintiffs did not even fax the letters to Chase or SLS. As previously discussed, S&I is not the servicer of the loan and does not fall within the ambit of RESPA liability. Even if Plaintiffs could establish that Chase and/or SLS received the letters, this does not suffice to create liability under RESPA. *See Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1147 (10th Cir. 2013).[19] Accordingly, the January 26 and May 31, 2016 do not trigger RESPA liability.

### B. Chase Timely Responded to the May 23, 2015 Letter and Fulfilled its Duties.

Although Plaintiffs' inquiries do not qualify as QWRs under RESPA, even if they did, there is no dispute that Chase responded within the timeframes mandated by RESPA to all correspondence sent *to* Chase—namely, the May 23, 2015 letter.

RESPA requires that a servicer "provide a written response acknowledging receipt of the [QWR] within 5 business days" and, within 30 days, either (1) make appropriate corrections to the account and inform the borrower in writing of such corrections; or (2) conduct an investigation and provide the borrower with a written statement that explains why the account is correct and gives the borrower the contract information of a person or department that can process further inquiries. § 2605(e)(1)(A), (2). Tasha Ford's letter of May 23 was received on May 29, 2015. SMF ¶47. Two business days later, on June 2, 2015, Chase sent Tasha Ford a letter with the heading "Confirmation of Your Inquiry." SMF ¶48. This letter explained that charges totaling $904.82 could not be removed from the Fords' account because it had multiple

---

[19] Holding that the plaintiff's twenty-eight faxed letters to mortgage servicer were not QWRs sufficient to trigger liability under RESPA, even if the servicer actually received the fax; *Bally*, *supra*, 2005 WL 2250856, at *3 (rejecting plaintiff's argument that faxing letters to defendant was sufficient to trigger RESPA "because even if the letters had been faxed or otherwise received by defendant, plaintiff failed to send her correspondence to the correct address").

late charge assessments.  *Id.*  Additionally, on June 4, 2015, Chase sent Tasha Ford a letter indicating it "received your question or request about your mortgage loan and are researching the issue."  SMF ¶49.  This acknowledgment was sent within the five business day window.

Similarly, Chase sent Tasha Ford a substantive response to her May 23, 2015 letter within the statutorily required timeframe, which ran until June 29, 2015.  On June 15, 2015, Chase sent a Tasha Ford a letter containing information regarding the Fords' credit report.  SMF ¶50.  On June 19, 2015 and again on June 22, 2015, Chase sent Tasha Ford a letter with the heading "Here's an explanation of the changes to your escrow account letter."  SMF ¶51.  This letter consists of four pages of analysis regarding the Fords' account, an explanation of the escrow process, and the basis for escrow calculations from 2012 through 2015: the reason why the account was correct.  *See id.*

### C.  The Fords Did Not Send Any QWR to SLS.

The Fords do not identify any purported QWR they claim to have sent to SLS after SLS began servicing the account.[20]  SMF ¶57.  The Fords cannot establish any claim against SLS for failure to respond to any "inquiries" made to either Chase or S&I (let alone inquiries that do not qualify as QWRs as a matter of law).[21]

---

[20] In an April 26, 2016 letter to the Fords, SLS acknowledged *prior* correspondence that had been sent to S&I, and stating the request for information was under review. SMF ¶57. This same letter provides a designated address for QWRs. *Id.*  In a follow-up letter dated May 24, 2016, SLS informed the Fords that it researched the account, found no errors, and that foreclosure sale was scheduled for June 2. SMF ¶58. SLS also enclosed copies of the loan's payment history and service transfer notification, a reinstatement quote, and a letter stating that QWRs "MUST" be sent to a designated address. *Id.* This information also appears on SLS's website. *Id.*

[21] 12 U.S.C. § 2605(e); *see Johnson v. BNC Mortgage Corp.*, No. 09-14717, 2010 WL 3515800, at *4 (E.D. Mich. Sept. 8, 2010) (granting summary judgment where record showed that servicer "was not the loan servicer during the relevant time frame" when QWR was sent); *Morris v. Equi First Corp. et al.*, No. 3:09-cv-1086, 2010 WL 890877, at *5 (M.D. Tenn. Mar. 9, 2010) (overruling objection and dismissing RESPA claim against co-defendants where plaintiff failed to allege he "inquired about information relating to the servicing of his loan from" co-defendants).

Because the Fords never sent a QWR to SLS's designated address, SLS did not violate any portion of RESPA. Accordingly, there is no dispute that Defendants fulfilled their statutory duties under RESPA, Defendants are entitled to judgment as a matter of law and Plaintiffs' RESPA claims should be dismissed.

## IV. Plaintiffs' Declaratory Judgment Claim Fails as a Matter of Law.

Plaintiffs claim that there is an "actual controversy" as to the title to their property, based on their allegations relating to the impropriety of foreclosure. FAC ¶ 74. "The burden of proof imposed upon a party seeking rescission of a foreclosure sale is substantial, and courts do not set aside foreclosure sales lightly." *Coleman v. Indymac Venture, LLC*, 966 F. Supp. 2d 759, 772 (W.D. Tenn. 2013). As explained above, it cannot reasonably be disputed that the Fords were in default and that Chase provided all notices required by the Deed of Trust. Accordingly, foreclosure was proper according to the terms of the Deed of Trust. *See, e.g., Evans v. Wells Fargo Bank, N.A.*, No. 15-2725-STA-CGC, 2015 WL 9244607, at *4 (W.D. Tenn. Dec. 17, 2015) (considering claim for declaratory judgment and quiet title in same analysis where promissory note showed that defendants had right to enforce lien, and dismissing both claims).

Further, Tenn. Code Ann. § 35-5-106, provides if a sale proceeds without complying with "the provisions of this chapter, the sale shall not, on that account, be either void or voidable." *Accord Fed. Nat. Mortgage Ass'n v. Robilio*, No. W200701758COAR3CV, 2008 WL 2502114, at *7 (Tenn. Ct. App. June 24, 2008).[22] Therefore, "the mere failure to give notice of the foreclosure sale in accordance with applicable law is not sufficient to set aside a foreclosure sale." *EverBank v. Henson*, No. W2013-02489-COA-R3CV, 2015 WL 129081, at *8 (Tenn. Ct.

---

[22] A sale may also be set aside if there is "some evidence of irregularity, misconduct, fraud or unfairness on the part of the trustee or mortgagee *that caused or contributed to inadequate price*." *Coleman*, 966 F. Supp. 2d at 772 (citing *Holt v. Citizens Cent. Bank*, 688 S.W.2d 414, 416 (Tenn. 1984)) (emphasis added). Plaintiffs have not alleged that the property sold for an inadequate price.

App. Jan. 9, 2015); *accord Nationstar Mortgage, LLC v. Humphrey*, No. 11-2185-STA, 2011 WL 3273077, at *5 (W.D. Tenn. July 29, 2011) (dismissing claim to set aside the foreclosure sale based on the failure to comply with statutory notice requirements because "the failure to give notice under the statute does not render the sale void or voidable"). As also set forward with respect to the breach of contract claim, the Fords have failed to demonstrate a lack of actual notice or any harm caused by any purported failure to comply with the Tennessee Code. There is therefore no genuine dispute as to the validity of the foreclosure, and the declaratory judgment claim fails as a matter of law.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant their Motion for Summary Judgment, award costs and fees, and grant such further relief as the Court may deem just and appropriate.

Submitted August 4, 2017.      Respectfully submitted,

/s/ James A. Haltom
JAMES A. HALTOM (BPR NO. 28495)
Nelson Mullins Riley & Scarborough, LLP
150 Fourth Avenue, North, Suite 1100
Nashville, TN 37219
Phone: (615) 664-5339
Email: James.Haltom@nelsonmullins.com
*Attorney for Defendants*

## CERTIFICATE OF SERVICE

I certify that the foregoing document has been served upon all counsel of record for the parties at interest in this cause by placing a true and correct copy of same in the United States mail, postage prepaid, in a properly addressed envelope; and electronically through the CM/ECF system to the attorney of record as follows:

Webb A. Brewer
Brewer & Barlow, PLC
1755 Kirby Parkway, Suite 110
Memphis, TN 38120

Bo Luxman
Luxman Law Firm
44 N. 2nd Street, Suite 1004
Memphis, TN 38103

Jason K. Purser
Shapiro & Ingle, LLP
10130 Perimeter Parkway, Suite 400
Charlotte, NC 28216

Malcolm B. Futhey III
THE FUTHEY LAW FIRM PLC
1440 Poplar Avenue
Memphis, Tennessee 38104

Erno Linder, Esq.
Baker Donelson Bearman Caldwell &
Berkowitz
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103

Submitted August 4, 2017.

*/s/ James A. Haltom*
James A. Haltom