**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT
OF TENNESSEE, WESTERN DIVISION**

| | | |
|---|---|---|
| **KELVIN FORD and** | ) | |
| **TASHA FORD,** | ) | |
| | ) | |
| **Petitioners,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No.** |
| | ) | **2:16-cv-02414-JPM-tmp** |
| | ) | |
| **SPECIALIZED LOAN SERVICING, L.L.C.,** | ) | |
| **JPMORGAN CHASE BANK, N.A.,** | ) | |
| **SHAPIRO & INGLE, L.L.P.,** | ) | |
| **MARATHON MANAGEMENT, L.L.C.,** | ) | |
| **MARVIN'S GARDEN, L.L.C., and** | ) | |
| **AUCTION.COM, INC.** | ) | |
| **.** | ) | |
| **Respondents,** | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS
JPMORGAN CHASE BANK, N.A. AND SPECIALIZED LOAN SERVICING, L.L.C.'S
MOTION FOR SUMMARY JUDGMENT**

COME NOW the Plaintiffs, by and through undersigned counsel, and hereby respond in

opposition to the Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of

Civil Procedure filed by JPMorgan Chase Bank, N.A. ("Chase") and Specialized Loan Servicing,

L.L.C. ("SLS").

## PROCEDURAL HISTORY

This case was removed to this Court from the Shelby County Chancery Court on June

13,2016 (ECF No.1). Plaintiffs filed a *pro se* Amended Complaint on July 13, 2016 asserting the

following claims: (1) breach of contract against Chase, SLS, and Shapiro & Ingle, LLP

("Shapiro"); (2) breach of the covenant of good faith and fair dealing against Chase, SLS,  and

Shapiro; (3) fraud and deceit against Chase, SLS, Shapiro, and Auction.com; (4) violation of

RESPA against Chase, SLS, Shapiro, and Auction.com; (5) violation of escrow waiving against Chase; (6) quiet title/set aside foreclosure sale; (7) declaratory judgment that Plaintiffs are the owners of the property and are entitled to its possession. (ECF No.18 at Pages 114-155). Defendants filed motions to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF Nos. 30, 32 ,33, 35, and 47), and Plaintiffs filed *pro se* responses. (ECF Nos. 52, 53, 54, 56, and 57).  Plaintiffs filed a *pro se* motion to amend the Amended Complaint (ECF No. 72), and Defendants Chase, SLS, Marathon Management, LLC, and Marvin's Garden, LLC filed responses in opposition. (ECF Nos. 73, 74, and 75.)

The Magistrate Judge addressed the Defendants' motions to dismiss the Amended Complaint and Plaintiffs' Motion to Amend the Amended Complaint in a Report and Recommendation issued on January 24, 2017. (ECF No. 79.)   The Court entered an Order Adopting in Part Report and Recommendation on March 13, 2017. (ECF No. 91.) In its order, the Court denied without prejudice Defendants' motions to dismiss and granted Plaintiffs fourteen days to file a Second Amended Complaint.  (*Id.* at Page 716.)  Plaintiffs did not file a Second Amended Complaint.   Defendants filed Motions to Renew their motions to dismiss the Amended Complaint (ECF Nos. 96, 99,100, 105), and the Court reinstated their motions to dismiss. (ECF Nos. 104, 106.)

Plaintiffs retained counsel in May of 2017 (ECF No. 116) and filed a Motion to Amend Order Adopting in Part Report and Recommendation requesting additional time to file a Second Amended Complaint.   The Court denied Plaintiffs' motion. (ECF No. 125.)  Defendants filed Motions for Summary Judgment on August 4th, August 6th and August 7th, 2017.  (ECF Nos. 131, 133, and 137.)

On August 9, 2017, the Court entered an Order granting in part and denying in part Defendants' Motions to Dismiss the Amended Complaint. (ECF No. 138.) In its Order the Court granted the motions to dismiss as to all of the claims in the Amended Complaint except for the claim for breach of the Deed of Trust against Chase and SLS on the grounds that the Fords were not in default in Count 1, the claim to set aside the sale in Count 6, and Count 7-Declaratory Judgment. (*Id.* at Pages 16-17.) The Court dismissed Shapiro from the case. (*Id.* at Page 16.)

## STATEMENT OF FACTS

On July 2, 1999, the property at 7421 Iris Cove, Memphis, Tennessee 38125 ("the Property") was conveyed to Tasha Ford by warranty deed. ((Defendants Chase and SLS's Statement of Material Facts ("Chase/SLS SMF") ¶1).) On August 12, 2003, Tasha Ford executed a note ("Note") in the amount of $168,550.00, and Tasha and Kelvin Ford signed a Deed of Trust as security for the loan, secured by the Property. (Chase/SLS SMF ¶¶ 2-3.) The only event listed in the Note that triggers a default is the failure to pay the monthly payments of principal and interest; this is found at ¶6(B) of the Note, which states as follows:

> **(B) Default**
> If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(Plaintiffs' Statement of Additional Facts ("SAF") ¶1 ; *See also,* Chase/SLS SMF ¶7.) The Note specifically describes what constitutes "monthly payments" and what is required at ¶3(A), which states as follows:

> 3. **PAYMENTS**
>
> **(A) Time and Place of Payments**
>
> I will pay principal and interest by making a payment every month.

I will make my monthly payment on the first day of each month beginning on October 1, 2003. I will make these payments every month until I have paid all of the principal and interest and any other charges below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If on September 1, 2033, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O BOX 78824
PHOENIX, AZ 85062     or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**
My monthly payment will be in the amount of U.S, $983.61

(SAF ¶2.) The Fords made timely automatic payments of that amount ($983.61) and more each month to provide the full monthly payment amount as well as additional funds for escrow. (SAF ¶3.)

The Deed of Trust requires the Fords to pay funds for Escrow Items pursuant to Section 3, which specifies that the Borrower shall pay on the day Periodic Payments are due "to provide for payment of amounts due for: (a) taxes and assessments. . .;(c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums. . ." (Defendants' SMF ¶ 4-5). The Deed of Trust defines 'Periodic Payment' as "the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument." (Defendants' SMF ¶ 6). Chase calculated the monthly escrow amount for the "periodic payment" by adding the amount of homeowners' insurance to the amount of county tax and dividing it by twelve. (SAF ¶27.). The Fords' automatic payments each month included the full amount of principal and interest under the Note and an additional amount as required under Section 3 to cover the homeowners' insurance and county tax. (SAF ¶3.)

Over the years the Fords had experienced problems with Chase incorrectly increasing the escrow amount and falsely claiming that the Fords had missed monthly payments.  (SAF ¶4.) When this occurred, Chase falsely asserted that the Fords were in default even though they timely made all their payments by the first of each month.   (SAF ¶5.)  These mistakes negatively impacted the Fords' credit report. (SAF ¶6.)  This happened in or around 2009 and again in 2012. (SAF ¶5, ¶7.) When this problem had occurred previously, the issues were resolved after the Fords disputed the default status and requested that Chase clear up the account.  (SAF ¶8.)  In a letter from April 2012 in response to one of Chase's default letters, Tasha Ford stated the following:

. . .

I am writing to dispute the default status and to request that you clean up my account within thirty days.  In addition, all negative items reported to the credit reporting agencies must be removed within 30 days.

I've enclosed a copy of the automatic payments made from my bank account.  As you will notice, all payments made in the amount of $1,236.94 were made by the first of each month.  I have not missed a single payment.  The records of my account need to reflect on time payments for the principal and interest for all of 2011 and the first four months of this year.

After you raised the amount of payment due to $1315, my husband Kelvin Ford, called and told you that you were requesting too much for the escrow amount.  He did not want you to hold our money then send us a refund check this year, like you did last year.  You all agreed to accept the previous amount of  $1,236.94

. . .

Because you received in excess of the principal and interest each month in a timely fashion, this account cannot be in default.  Furthermore, this account did not have any late payments, nor can it be charged any late fees.  If this is not resolved within thirty days, I will bring a legal action against your company.

(SAF ¶9)

On this occasion, Chase acknowledged their mistake to Mr. and Mrs. Ford over the phone and sent a letter to Tasha Ford dated April 23, 2012, notifying her that it had notified the credit reporting agencies that the payment status was current.  (SAF ¶10)

Ultimately, it was agreed on that the required amount for periodic payments of principal interest and escrow would be $1,280.19.  (SAF ¶11.) The Fords set up automatic payments of $1,280.12 to ensure that their periodic payments were timely.  (SAF ¶15.)  In 2013, the Fords' homeowners' insurance premium apparently increased and their property tax decreased.  (SAF ¶12.)  While Chase updated the increase in homeowner's insurance in its calculations, it did not use current data for the reduced County Tax amount and insisted on an increase of periodic payments.  (SAF ¶¶13-14.) The Fords again disputed the escrow calculations. (SAF ¶16.)

In 2013 and 2014 Kelvin Ford called Chase numerous times asking the representatives with whom he spoke to review the escrow account and provide an explanation for the escrow increases and proof of the cost of insurance. (SAF ¶14.) He explained that the issue with an improper escrow increase had just occurred in 2012 and that he and his wife wanted to make sure that it did not happen again. (SAF ¶18.) Each time Mr. Ford talked to a Chase representative, he was assured that they would take a look at the account and provide an explanation. (SAF ¶19.) Apparently during this time the insurance had switched and the Ford's insurance had increased, but the Fords were not aware of it.  (SAF ¶20.)  While the Fords were waiting for Chase to respond to their inquiries, the Fords made every payment of $1,280.19 in a timely fashion. (SAF ¶21.) The Fords did not make a single late payment; therefore they should not have been charged with any late fees.   (SAF ¶22.)  Tasha Ford explained these facts to Chase in a letter dated May 23, 2015, and Kelvin Ford sent a similar letter to Shapiro & Ingle on May 23, 2015 (SAF ¶23.) As of May 23, 2015, Chase still had not addressed the Fords' dispute about the amount of

escrow, but had continued to accept their regular monthly payments.  (SAF ¶24)  Instead, Chase had sent a letter dated April 12, 2015 stating that the mortgage payment was past due and that Chase intended to initiate a foreclosure action. (*See* Defendants' SMF ¶19). Chase also sent a letter on May 1, 2015 stating that Chase was unable to accept a check in the amount of $1,280.19, because "four or more monthly installments are due but unpaid." (*See* Defendants' SMF ¶20).

In response to the Fords' letters and repeated telephone contacts, Chase finally sent the Fords an explanation of the changes to the escrow account by letter dated June 19, 2015 (the "June 19 Letter"). (SAF ¶25.)   The June 19 letter stated that Chase had identified an escrow shortage of $494.05, and showed how the payment was calculated. (SAF ¶26.)  According to the June 19 Letter, Chase calculated the escrow payments solely based on the annual amount of County Tax and annual amount of Homeowners Insurance. SAF ¶27.)  This letter, which was extraordinarily confusing, made no direct reference to using a calculation of a two-month payment cushion as provided by the Real Estate Settlement Procedures Act (SAF ¶28.)  The June 19 letter showed the annual amount of County Tax as $1,872.55 and the annual amount of Homeowner's Insurance as $3,187. (SAF ¶29.)   There was no escrow cushion factored in to Chase's analysis.  (SAF ¶30.)   In fact, the Fords had never received any analysis or statement from Chase stating that they were including an escrow cushion.   (SAF ¶31.)   The actual annual amount of the Fords' homeowner's insurance at that time was $2,621. (SAF ¶32.)   The Fords had solicited bids from insurance companies and selected GEICO, which is how they knew that the exact amount was $2,621.  (SAF ¶33.)  Chase was on notice of that amount, but failed to use the current amount in its calculations. (SAF ¶34.)  The June 19 Letter stated that the escrow

analysis had identified an escrow shortage of $495.05. (SAF ¶26.) The June 19 Letter stated the following:

> We have spread the repayment of your escrow shortage over 12 installments by adding $41.17 to your monthly payment beginning May 1, 2015.
>
> If you would prefer, you may repay the $494.05 escrow shortage in full and request a new escrow analysis.
>
> (SAF ¶35.)

This letter came after Chase had threatened to initiate foreclosure because it claimed that the Fords were more than four months in default on their payments and had refused to accept a regular payment. (SAF ¶36.) This compounded the Fords' confusion about the status of their mortgage. When the Fords received the June 19th letter, they attempted to resolve the issue with even more vigor. (SAF ¶37.) Kelvin Ford made repeated calls to Chase informing them that they were using the incorrect amount for homeowners' insurance in their calculations and requesting that Chase recalculate the escrow based on the appropriate amount. (SAF ¶38.)

Each time Mr. Ford called Chase, he was assured that Chase would recalculate the escrow; however, it was never done. (SAF ¶39.) Eventually, in or about June of 2015, the Fords attempted to pay the insurance premium directly to the insurance company to avoid being overcharged by Chase. (SAF ¶40.) GEICO sent a notice of the Fords' payment to Chase, and Chase informed the Fords that they could not pay for the homeowners' insurance directly. (SAF ¶41.) Chase then paid GEICO the amount that the Fords had previously paid, and GEICO refunded the Fords their $2,621. (SAF ¶42.) With no resolution to the escrow dispute after the phone conversations and Chase representatives' repeated assurances that they would look into the issue and recalculate the escrow, the Fords decided to send written correspondence to address

the June 19 letter, and raise the issues previously discussed with Chase by phone. (SAF ¶43.)
The Fords sent the letter to Shapiro, as they had been instructed to direct written correspondence
to Shapiro, and enclosed a check for the full amount to repay the alleged escrow shortage plus
the amount of shortage based on Chase's revised payment amount. (SAF ¶44.)

The Fords eventually decided that since Chase never followed through on its promises to
recalculate the escrow and resolve the dispute, they would just pay what Chase claimed they
owed even though they were convinced Chase's calculations were flawed. Based upon Chase's
confusing June 19 letter, the Fords determined that the monthly payments should be $1,405.24[1]
once they paid the shortage of $494.05, which Chase's letter had presented as an option. (SAF
¶45.) The Fords had been paying $1,280.19 automatically each month. (SAF ¶47.) Even
though the Fords disagreed about the payment amount Chase had determined using an incorrect
homeowner's insurance premium, they calculated the difference between the monthly payments
they had been making and that which Chase contended they owed. (SAF ¶48.) The amount that
their payments were deficient according to Chase was $125.05 for 6 months, which equals
$750.30. (SAF ¶49.) The Fords added $750.30 to $494.05 to come up with $1,244.35 for the
total amount that they owed according to Chase. (SAF ¶50.) The Fords enclosed a check for
$1,244.35 to cover the entirety of what Chase claimed was the shortage, along with the checks
that had previously been returned. (SAF ¶51.) However, the check for $1,244.35 was also
returned to the Fords. (SAF ¶52.)

The Fords had requested on several occasions to pay their own property taxes and
homeowner's insurance to eliminate the need for an escrow account and avoid disputes. (SAF
¶42.) The Deed of Trust provides that the lender may waive the escrow requirement. (*See* Deed

---

[1] $1,446.41, the monthly payment amount determined by Chase, minus $41.17, the amount
spread over 12 installments for the shortage, equals $1,405.24.

of Trust, Chase Dec. ECF No. 132-2, ¶3, p. 10.) Given the history of documented errors in handling the escrow account on the part of Chase and the Fords history of reliably making monthly payments the denial of the request to allow them to pay taxes and insurance directly was arbitrary. (*See* SAF ¶53.) Further, it appeared that Chase was misapplying the funds on the Fords account. (SAF ¶54.) A detailed transaction history provided by Chase did not show application of payments made on July 1, 2013 (Ref.#224), October 1, 2014 (Ref. #305), April 1, 2015 (Ref. #345), and May 1, 2015. (SAF ¶55.) The transaction history also did not show any of the payments the Fords had made since September of 2015. (SAF ¶56.) Chase returned those checks to the Fords, but the Fords did not cash them because they believed they were returned in error. (SAF ¶57.) Mr. Ford sent a letter to Shapiro & Ingle LLP on January 26, 2016 explaining what had transpired and requesting that the foreclosure sale be stopped. (SAF ¶58.)

From early 2015 until April 2016, the Fords made repeated inquiries with Chase regarding the status and application of their escrow account, the misapplication of funds from payments made by the Fords, removal of negative credit items from credit reports, and removal of the account from foreclosure. (SAF ¶59.) Rather than resolve the problems with the account, the Defendants tacked on late fees and Corporate Advance fees, sent Accelerating Warnings claiming that the Fords were past due by very large amounts of money, and caused foreclosure proceedings to be initiated on the Fords' home. (SAF ¶60.) Chase and SLS failed to properly research the issues raised by the Fords and did not give them an adequate explanation of the status of their escrow account or genuinely attempt to resolve the escrow dispute as Chase had done when the same issue had arisen in the past. The foreclosure sale was postponed and rescheduled several times but ultimately went forward on June 2, 2016. The Fords have suffered damages as a result of Chase and SLS's breach of contract including, but not limited to,

the loss of title to their home in the foreclosure sale, loss of equity in their home, distress, and damages to their credit. (SMF ¶61.)

## STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a) of the Federal Rules of Civil Procedure. *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). A "genuine issue of material fact" is a fact which, if proven at trial, could lead a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering whether summary judgment is appropriate, the Court must "look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial." *Sowards v. Loudon Cnty.*, 203 F.3d 426, 431 (6th Cir.), *cert. denied*, 531 U.S. 875, 121 S. Ct. 179, 148 L.Ed.2d 123 (2000). The court must view the evidence and all inferences drawn from underlying facts "in the light most favorable to the party opposing the motion." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., Ltd.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing the absence of genuine factual disputes from which a reasonable jury could return a verdict for the non-moving party. *Anderson,* at 249–50. However, "[t] he moving party need not support its motion with evidence disproving the non-moving party's claim, but need only show that 'there is an absence of evidence to support the non-moving party's case.' " *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir.2001) (quoting *Celotex Corp.*, 477 U.S. at 325).

## ARGUMENT

**I.  Summary Judgment Should be Denied on the Breach of Contract Claim Because Plaintiffs Were Not in Default.**

In Tennessee, it is axiomatic that the elements of a breach of contract claim are the existence of an enforceable contract, a breach of the contract, and damages resulting from the breach. *Life Care Centers of Am v. Charles Town Associates Ltd. P'ship* 79 F.3d 496, 514 (6th Cir., 1996). Summary judgment is inappropriate on the Fords' breach of contract claim because there was no material breach of the terms of the relevant Promissory Note or Deed of Trust ("DOT") between the parties that justified the acceleration of the loan balance and foreclosure of the Plaintiffs' home by Chase and SLS. At a minimum, summary judgment should be denied on the breach of contract claim because there is a material question of fact as to whether or not the Fords were in default to justify these Defendants' acts in foreclosing.

The only event that triggers a default under the Note executed by Mrs. Ford in 2003 is the failure to pay the monthly payments of principal and interest; this is found at ¶6(B) of the Note, which states as follows:

> **(B) Default**
> If I do not pay the full amount of each monthly payment on the date it is
> due, I will be in default.

(SAF¶ 7; *See also,* Defendants' SMF" ¶7.) Defendants have attempted to define monthly payments based on the "periodic payments" referred to in the DOT to make it appear that the Fords were in default. However, the Note specifically describes what constitutes "monthly payments" and what is required at ¶3(A), which states as follows:

> 3. **PAYMENTS**
> **(A) Time and Place of Payments**
>
> I will pay principal and interest by making a payment every month.
> I will make my monthly payment on the first day of each month beginning on
> October 1, 2003. I will make these payments every month until I have paid all of the
> principal and interest and any other charges below that I may owe under this Note.
> Each monthly payment will be applied as of its scheduled due date and will be
> applied to interest before Principal. If on September 1, 2033, I still owe amounts

under this Note, I will pay those amounts in full on that date, which is called the
"Maturity Date."

I will make my monthly payments at P.O BOX 78824
PHOENIX, AZ 85062      or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**
My monthly payment will be in the amount of U.S, $983.61

(SAF ¶ 2). Under these sections it is clear that the term "monthly payments" refers to the

$983.61 payment of principal and interest, not the "periodic payments" defined in the DOT as

Defendants infer.  The Fords made timely automatic payments of that amount ($983.61) and

more each month to provide the full monthly payment amount as well as additional funds for

escrow.  (SAF ¶3.)  Because the Note required monthly payments of $983.61 each month, and

the Fords made automatic monthly payments of that amount and more each month, the Fords

were not in default under the terms of the Note.

The DOT adds an additional requirement that the Borrower must pay funds for escrow,

which the Fords did.  Specifically, the Deed of Trust requires the Fords to pay funds for Escrow

Items pursuant to Section 3, which states that the Borrower shall pay on the day Periodic

Payments are due "to provide for payment of amounts due for: (a) taxes and assessments. . .;(c)

premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage

Insurance premiums. . ." (Defendants' SMF ¶ 4-5).  There were no mortgage insurance

premiums due from the Fords in the instant case. The DOT defines 'Periodic Payment' as "the

regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any

amounts under Section 3 of this Security Instrument." (Defendants' SMF ¶ 6). The Fords'

automatic payments each month included the full amount of principal and interest under the Note

and an additional amount as required under Section 3 to cover the homeowners' insurance and

county tax.  (SAF ¶2-3.)

DOT Section 3 explains how the Lender must determine the funds owed for Escrow Items:

> "Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law... If there is a shortage of Funds held in escrow as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage."

*See* Defendant's SMF ¶8. Chase claimed that it calculated the monthly escrow amount for the "periodic payment" by adding the amount of homeowners' insurance to the amount of county tax and dividing it by twelve. (SAF ¶27.) However, Chase regularly raised the amount of the escrow that it included in the periodic payments and did not always use current data or reasonable estimates of expenditures of future Escrow Items in its escrow calculations. (*See e.g.* SAF ¶¶ 4,5,9, 10, 13, 16, 29, 32, 38.) When this happened, the Fords called and/or wrote letters to Chase in order to dispute the calculations and attempt to resolve the issue.

The Real Estate Settlement Procedures Act (RESPA), and its implementing regulations speak to the method a mortgage servicer must use to compute escrow items in the administration of an escrow account. 12 CFR 1024.17(c)(7) provides the following:

SERVICER ESTIMATES OF DISBURSEMENT AMOUNTS

> To conduct an escrow account analysis, the servicer shall estimate the amount of escrow account items to be disbursed. *If the servicer knows the charge for an escrow item in the next computation year, then the servicer shall use that amount in estimating disbursement amounts.* If the charge is unknown to the servicer, the servicer may base the estimate on the preceding year's charge, or the preceding year's charge as modified by an amount not exceeding the most recent year's change in the national Consumer Price Index for all urban consumers. (CPI, all items). . . . (Emphasis added.)

While the Plaintiffs' claims under RESPA have been dismissed, the standards imposed on servicers thereunder are certainly relevant to these Defendants' administration of the escrow account and whether Chase, in particular, was justified in accelerating and ultimately foreclosing

on the property because of the Fords' alleged failure to make required escrow payments. It appears that Chase did not follow the guidance of this provision in calculating escrow payments in that it used figures other than those of which they had actual knowledge.

Over the years the Fords had experienced this problem with Chase improperly increasing the escrow amount. Chase also falsely claimed that the Fords had missed monthly payments. It is unclear whether this resulted from the application of regular principal and interest payments to alleged escrow shortages; however, the Fords state unequivocally that no monthly payments were missed until Chase began to refuse to accept payments. Chase added late fees even though the Fords timely made all their payments by the first of each month. These mistakes negatively impacted the Fords' credit report. This happened in or around 2009 and again in 2012. When this problem had occurred previously, the issues were resolved after the Fords disputed the default status and requested that Chase clear up the account. As noted above, in response to one of Chase's default letters, Tasha Ford sent a letter in April 2012 disputing the status of the account, providing information of payments, and demonstrating that the account was not in default. On this occasion, Chase acknowledged their mistake to Mr. and Mrs. Ford in correspondence by phone and sent a letter to Tasha Ford dated April 23, 2012, notifying her that it had notified the credit reporting agencies that the payment status was current.

Ultimately, it was agreed in 2012 that the required amount for periodic payments of principal interest and escrow would be $1,280.19. The Fords set up automatic payments of $1,280.12 to ensure that their payments were timely. In 2013, the Fords' homeowners' insurance premium went up and their property tax decreased. While Chase updated the increase in homeowner's insurance in its calculations, it did not use current data for the reduced County Tax amount and insisted on an increase of periodic payments. When Chase raised the periodic

payment again, the Fords disputed it.   In 2013 and 2014 Kelvin Ford called Chase numerous

times asking Chase to review the escrow account and provide an explanation for the escrow

increases and proof of the cost of insurance, explaining that the issue with an improper escrow

increase had just occurred in 2012 and that they wanted to make sure that it did not happen

again. Each time Mr. Ford called, a Chase representative would assure him that they would

review the account and provide an explanation.  While the Fords were waiting for Chase to

respond to their inquiries, the Fords made every payment of $1,280.19 in a timely fashion. They

were not late on the account a single day. The account did not have any late payments, and

therefore the Fords should not have been charged with any late fees. Tasha Ford again explained

these facts to Chase in a letter dated May 23, 2015, and Kelvin Ford sent a similar letter to

Shapiro & Ingle, the Substitute Trustee, the same day. As of May 23, 2015, Chase still had not

addressed the Fords' dispute about the amount of escrow. Instead, Chase had sent a letter dated

April 12, 2015 stating that the mortgage payment was past due and that Chase intended to

commence foreclosure. (Defendants' SMF ¶19).

     In response to the Fords' letters, Chase sent the Fords an explanation of the changes to

the escrow account by letter dated June 19, 2015 (the "June 19 Letter"). The June 19 letter stated

that Chase had identified an escrow shortage of $494.05, and showed how the payment was

calculated. According to the June 19 Letter, Chase calculated the escrow payments solely based

on the annual amount of County Tax and annual amount of Homeowners Insurance. The June 19

letter showed the annual amount of County Tax for 2015 as $1,872.55 and the annual amount of

Homeowner's Insurance as $3,187. There was no escrow cushion factored in to Chase's analysis.

In fact, the Fords had never received any analysis or statement from Chase stating that they were

including an escrow cushion. The actual annual amount of the Fords' homeowner's insurance

premium at that time was $2,621. The Fords had solicited bids and selected GEICO, which is how they knew that the exact amount was $2,621. Chase was on notice of that amount, but failed to use the current data in its calculations.

The June 19 Letter stated that the escrow analysis had identified an escrow shortage of $495.05. The June 19 Letter stated the following:

> We have spread the repayment of your escrow shortage over 12 installments by adding $41.17 to your monthly payment beginning May 1, 2015.
>
> If you would prefer, you may repay the $494.05 escrow shortage in full and request a new escrow analysis.

When the Fords received the June 19th letter,. Kelvin Ford made repeated calls to Chase representatives informing them that they were using the incorrect amount for the homeowners' insurance premium in their calculations, He requested that Chase recalculate the escrow based on the appropriate amount. He was assured that a Chase representative would recalculate the escrow; however, it never happened. Eventually, in August of 2015, the Fords attempted to pay the insurance amount to the insurance company directly to avoid being overcharged by Chase.  Chase informed the Fords that they could not pay for the homeowners' insurance directly. Chase then paid GEICO the amount that the Fords had previously paid, and GEICO refunded the Fords their $2,621. The Fords sent the letter to Shapiro, as they had been instructed to direct written correspondence to Shapiro, and enclosed a check for the full amount to repay the escrow shortage plus the amount of shortage based on Chase's revised payment amount.

The amount they had underpayed according to Chase was $125.05 for 6 months, which equals $750.30. The Fords added $750.30 to $494.05 to come up with $1,244.35 for the total amount that they understood they owed according to Chase. The Fords enclosed a check for

$1,244.35 to cover the entirety of what Chase claimed was the shortage, along with the checks that had previously been returned. However, the check for $1,244.35 was also returned to the Fords.

From early 2015 until April 2016, the Fords made repeated inquiries with Chase regarding the status and application of their escrow account, the misapplication of funds from payments made by the Fords. Rather than resolve the problems with the account, the Defendants tacked on late fees and Corporate Advance fees, and sent Accelerating Warnings claiming that the Fords were past due by very large amounts of money. Chase and SLS failed to properly research the issues raised by the Fords and did not genuinely attempt to fix the Fords' account and resolve the escrow dispute as Chase had done when this issue had arisen in the past. The foreclosure sale was postponed and rescheduled several times but ultimately went forward on June 2, 2016.

These Defendants cite *Hanas v. Seterus, Inc.* 92 Fed Supp. 3d 747 (E.D. Tenn. 2015 for the proposition that failure to make escrow payments required by the Deed of Trust results in a deficiency in support of their assertion that they were justified in foreclosing on the Fords' home. That case provides little support for their position. The case is very distinguishable factually in that the borrower in *Hanas* refused to make escrow payments for property taxes because he mistakenly argued that a state statute excused him from such payments. *Id* at 750. In the instant case escrow payments were being made on a monthly basis as part of the Fords regular mortgage payments. A good faith issue remains as to whether the monthly escrow payments had been properly calculated by Chase. Moreover, the language cited by the Defendants pertained to the borrower's defamation claim, rather than his breach of contract claim. The court simply found

that by reporting a deficiency on credit reports the loan servicer had not defamed the borrower because he had failed to make the payments. *Id* at 752.

Chase and SLS cite the case of *Asemota v. Suntrust Mort., Inc.,* No. 11-2816'-STA-DKV, 2012 WL 12550260 (W.D. Tenn. June 18, 2012) as supporting the proposition that a breach of contract claim should be dismissed where full escrow payments had not been made by the borrower. The breach of contract claim in that case, however, was dismissed based upon the statute of frauds and it provides little support for the assertion that dismissal of the Fords' breach of contract claim is appropriate. The plaintiffs there relied on an alleged verbal statement from a bank representative that they did not need to make escrow payments.

There are legitimate issues of fact regarding whether the escrow payments demanded by Chase and later SLS were accurate. The Plaintiffs tendered escrow payments that they believe were sufficient to pay county taxes and insurance premiums as required by the Deed of Trust until Chase stopped accepting them. Therefore, there remains an important factual issue as to whether Chase administered the escrow account in keeping with the Deed of Trust, rendering summary judgment inappropriate as to the breach of contract claims.

## II. Summary Judgment Should be Denied on the Claims to Set Aside Sale and for Declaratory Judgment Because Plaintiffs Were Not in Default.

As explained above, the foreclosure sale that occurred on June 2, 2016, purporting to transfer title to the Property and any deeds of conveyance resulting therefrom was defective because the Fords were not in default. Due to the Defendants' failure to follow the required procedures set forth in the Deed of Trust, the defective sale should be set aside and held as null and void and the Court should adjudge the Fords as the only true and lawful owners of the Property.

An actual controversy has arisen and now exists as to the title to and possession of the property. The Fords contend that the purported foreclosure sale of the Property that occurred

on June 2, 2016 was defective and unlawful and that they are the only true and lawful owners of the Property and are entitled to sole possession thereof. Wrongful foreclosure does not pass title through a Trustee's Deed. *See, Federal National Mortgage Association v. Robilio,* 2008 WL 2502114 (Tenn. Ct. App.).

Defendants' Motion for Summary Judgment as to the claims to set aside sale and for declaratory judgment should be denied.

## CONCLUSION

For all of the foregoing reasons, Defendants Chase and SLS's Motion for Summary Judgment should be denied and Plaintiffs should be allowed to go forward with their claims for damages for breach of contract; to set aside the sale; and for declaratory judgment.

Respectfully Submitted,

**The Law Offices of Webb A. Brewer, PLC**


By: ___/s/ Webb A. Brewer_____
    Webb A. Brewer (B.P.R. No. 9030)
    Allison S. Raines (B.P.R. No. 33897)
    Attorneys for Plaintiffs
    1755 Kirby Parkway, Suite 110
    Memphis, TN 38120
    (901) 757-3360

**The Luxman Law Firm**

By: /s/ Bo Luxman_____
    Bo Luxman (B.P.R. No. 21580)
    Luxman Law Firm
    Attorney for Plaintiffs
    44 N. 2nd Street, Suite 1004
    Memphis, TN 38103
    (901) 526-7770
    Bo@LuxmanLaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of September, 2017, the foregoing pleading has been served by electronic mail via the Court's electronic filing system or the United States mail, postage prepaid, to counsel for the Defendants.

/s/ Webb A. Brewer
Webb A. Brewer
