UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

KELVIN FORD and TASHA FORD,

    Plaintiffs,

v.                                                   Case No. 2:16-cv-02414-JPM-tmp

SPECIALIZED LOAN SERVICING, LLC,
JPMORGAN CHASE BANK, N.A.,
SHAPIRO & INGLE, LLP (dismissed),
MARATHON MANAGEMENT, LLC,
MARVIN'S GARDEN, LLC, and
AUCTION.COM, INC.,

    Defendants.

**ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT**

Before the Court is the Motion for Summary Judgment filed by Defendants JPMorgan Chase Bank, N.A. ("Chase") and Specialized Loan Servicing, LLC ("SLS") on August 4, 2017. (ECF No. 131.) Also before the Court is the Motion for Summary Judgment filed by Defendants Marathon Management, LLC ("Marathon") and Marvin's Garden, LLC ("Marvin") on August 7, 2017. (ECF No. 137.)

For the reasons discussed below, both motions are GRANTED. Specifically, Chase and SLS's Motion for Summary Judgment is GRANTED as to Plaintiffs' remaining breach of contract claim (Count 1). Chase and SLS's Motion for Summary Judgment is GRANTED as to Plaintiffs' claims to set aside the foreclosure sale (Count 6) and for declaratory judgment (Count 7). Marathon and Marvin's Motion for Summary Judgment is GRANTED as to as to Plaintiffs' claims to set aside the foreclosure sale (Count 6) and for declaratory judgment (Count 7).

## I. BACKGROUND

### A. Factual Background

On August 12, 2003, Plaintiff Tasha Ford borrowed $168,550 from Chase pursuant to a Note, and Plaintiffs Tasha and Kelvin Ford ("Plaintiffs") together signed a Deed of Trust securing Tasha Ford's loan with their property located at 7421 Iris Cove, Memphis, Tennessee (the "Property"). (See ECF No. 132-2, Exhibit A ("Note") at 978;[1] ECF No. 32-2, Exhibit B ("DOT") at 982.) Under the Note, Tasha Ford was required to make "monthly payments" of $983.61 from October 2003 until September 2033. (Note at 978.) Under the Deed of Trust, Tasha Ford was required to make "periodic payments" to Chase in the amount of her monthly payments under the Note plus an additional amount—to be estimated by Chase—covering "escrow items" such as property taxes and property insurance. (See DOT at 984-86.)

From 2012 to 2015, Chase sent Plaintiffs an "Annual Escrow Disclosure Statement" setting out the amounts of Plaintiffs' periodic payments, including Chase's estimates of the amounts due for escrow. (See ECF No. 157-4.) For 2012, the periodic payment was $1,280.19, including a monthly escrow estimate of $296.58. (Id. at 1889, 1892.) For 2013, the periodic payment was $1,330.90, including a monthly escrow estimate of $322.33 and a monthly escrow shortage of $24.96. (Id. at 1892.) For 2014, the periodic payment was $1,512.11, including a monthly escrow estimate of $347.29 and a monthly escrow shortage of $127.42. (Id. at 1897.) For 2015, the periodic payment was $1,446.41, including a monthly escrow estimate of $421.63 plus a monthly escrow shortage of $41.17. (Id. at 1902.)

---

[1] All citations to page numbers in docket entries are to the CM/ECF PageID number.

Plaintiffs contend that, in 2013 and 2014, they disputed their increased periodic payments. (ECF No. 150-2 at 1783.) Plaintiffs further contend that Chase's representatives assured Kelvin Ford that Chase would review Plaintiffs' escrow account and provide an explanation. (Id.) Plaintiffs contend that, "[w]hile [they] were waiting for Chase to respond to their inquiries, [they] made every payment of $1,280.19 in a timely fashion." (Id.)

During 2013 and 2014, Chase sent multiple "Acceleration Warning" letters to Plaintiffs warning that their payments were past due and that their loan might be accelerated.[2] (See, e.g., ECF No. 132-2 at 1035; see also ECF No. 150-1 at 1769.) Plaintiffs, however, continued to make payments to Chase in the amount of $1,280.19 per month. (See ECF No. 132-2 at 1107-27; see also ECF No. 150-1 at 1764.)

On April 14, 2015, Chase sent Tasha Ford a letter with the subject line: "Your mortgage loan payment is past due and your property may be referred to foreclosure." (ECF No. 132-2 at 1065.) The letter stated that "[t]he total amount needed to reinstate or bring the account current is $5,696.52" and that "[t]he amount of late payment fees included in the above reinstatement amount is $865.48." (Id.) The letter further stated that "Chase intends to cause a foreclosure action to be commenced on the mortgaged property." (Id. at 1066.)

On May 1, 2015, Chase sent Tasha Ford a letter stating that Chase could not accept Plaintiffs' payment in the amount of $1,280.19 because "[f]our or more monthly installments [were] due but unpaid." (ECF No. 132-2 at 1069.) On May 23, 2015, Tasha Ford sent a letter to Chase stating that:

---

[2] Chase contends that it sent twenty (20) acceleration warnings, but Plaintiffs dispute this for lack of knowledge about the precise number of letters sent. (ECF No. 150-1 at 1769.)

> Three years ago, we went through the same thing with your company. The issue is that you initially agree to escrow payment amounts and then change the required amount later.
>
> . . .
>
> To this date, you still have not addressed our dispute about the amount of escrow. In the meantime, we have made every payment of $1280.19 in a timely fashion. We have not been late a single day with this account. As I have said in the past to you, because you received in excess of the principle [sic] and the interest each month in a timely fashion, this account cannot be in default. Furthermore, because this account did not have any late payments, it cannot be charged any late fees. If this is not completely resolved within thirty days, I will bring a legal action against your company. I am requesting written confirmation of the actions that you take to resolve this matter.

(ECF No. 150-10 at 1856.) On June 19, 2015,[3] Chase sent Tasha Ford a letter "in response to [her] inquiry" stating: "We analyze your escrow account every year to see if your monthly payment is enough to pay your tax and insurance and to maintain any minimum account balance (cushion)." (ECF No. 132-3 at 1083.) Chase's letter also stated that "We have spread the repayment of your escrow shortage over 12 installments by adding $41.17 to your monthly payment beginning May 1, 2015. If you would prefer, you may repay the $494.05 escrow shortage in full and request a new escrow analysis." (Id. at 1086.) Following this exchange, Chase accepted payments in the amount of $1,280.19 from Plaintiffs for the months of July and August of 2015. (See ECF No. 132-2 at 1009.)

Chase stopped accepting Plaintiffs' payments in September 2015. (See ECF No. 150-1 at 1767). Plaintiffs continued to send monthly payments to Chase in the amount of $1,280.19 from September 2015 to April 2016, but Chase returned those payments to Plaintiffs and sent letters each month explaining that Chase was not accepting the payments because they were insufficient to bring Plaintiffs' account up to date. (See id.; ECF No. 132-3 at 1116-23.)

---

[3] Chase sent an identical letter to Tasha Ford on June 22, 2015. (ECF No. 132-3 at 1087.)

4

On September 29, 2015, Chase sent Tasha Ford an "Acceleration Warning" letter stating that she was "in default because [she had] failed to pay the required monthly installments commencing with the payment due 04/01/2015." (ECF No. 132-3 at 1125.) The letter stated that, as of September 29, 2015, the total amount "past due" under the terms of Tasha Ford's loan documents was $10,880.30, including "Total Monthly Payments" of $8,744.16, "Late Fees" of $904.82, and "Advances" of $1,962.96. (Id.)

On November 5, 2015, Chase's substitute trustee, Shapiro & Ingle, LLP ("Shapiro"), sent Plaintiffs a letter stating that the Property was scheduled for a foreclosure sale. (ECF No. 132-2 at 1071-72.) The foreclosure sale was scheduled for December 17, 2015 at 10:00 a.m. at the Comfort Inn Downtown, 100 N. Front Street, Memphis, Tennessee. (Id.)

On December 10, 2015, Kelvin Ford sent Shapiro a letter requesting that Shapiro cease and desist foreclosure proceedings. (ECF No. 150-6.) He enclosed a check for $1,244.35,[4] in addition to three previously-returned checks for $1,280.19. (See id.; see also ECF No. 158-1 at 1931.) The payment was not accepted. (See ECF No. 158-1 at 1934.)

On December 16, 2015, Chase sent Tasha Ford a letter enclosing the payment history for her loan as well as a letter enclosing a reinstatement quote for the loan. (ECF No. 132-3 at 1145-70.) The letter enclosing a reinstatement quote stated that:

> The total amount due to reinstate the loan is $16,782.97, which is good through 12-31-15. If you can't pay this total amount by that date, the amount you owe may increase because of items such as additional interest, fees and costs (including those related to any foreclosure activity), property inspections and valuations.

---

[4] In his Declaration, Kelvin Ford explains that he believed $1,244.35 covered "the entirety of what Chase claimed was the shortage" because it equaled $494.05 (the yearly escrow shortage for 2015) plus $750.30 ($125.05 multiplied by six months, which, according to Kelvin Ford, is "[t]he amount that we were short according to Chase"). (See ECF No. 150-3 at 1797.)

5

(ECF No. 132-3 at 1168.) The letter included an itemized reinstatement quote, which stated that, after accounting for $731.64 of partial payments in Plaintiffs' suspense account, Plaintiffs owed $13,083.39 in payments due, $904.82 in late charges, $2,979.40 in corporate advances,[5] and $547 in attorney fees and costs, for a "Total Reinstatement Amount" of $16,782.97. (See id. at 1168.)

In December, January, March, and April of 2016, both Chase and Shapiro sent Tasha Ford letters stating that the Property's foreclosure sale had been rescheduled. (See ECF No. 132-2 at 1136-43; ECF No. 36-1 at 348-355.) The foreclosure sale was ultimately scheduled for June 2, 2016. (See ECF No. 132-2 at 1043; ECF No. 36-1 at 354.)

On April 1, 2016, Chase sent Tasha Ford a letter stating that Chase had transferred servicing of her loan to SLS. (ECF No. 132-3 at 1185.) On April 22, 2016, Chase assigned the Deed of Trust to SLS. (ECF No. 132-3 at 1194.)

On April 26, 2016, SLS sent Tasha Ford a letter acknowledging receipt of a letter from Plaintiffs that was sent to the wrong mailing address and stating that Plaintiffs' request was under review. (See ECF No. 36-1 at 411.) On May 24, 2016, SLS sent Plaintiffs a follow-up letter stating that SLS had found no errors with their account and that the Property's foreclosure sale was scheduled for June 2, 2016. (See ECF No. 36-1 at 393-94.) SLS enclosed copies of the loan's payment history, the Notice of Servicing Transfer, and a reinstatement quote of $24,852.94. (See id. at 395-408.) This action followed.

---

[5] As Chase explained to Plaintiffs in a letter sent on December 30, 2015, the corporate advances covered fees for several home inspections "to confirm occupancy or check the condition of the property when a monthly payment is more than 45 days past due." (See ECF No. 132-3 at 1179.)

B.     **Procedural Background**

On June 2, 2016, Plaintiffs filed a Petition for Injunctive Relief in the Chancery Court of Shelby County, Tennessee. (See ECF No. 1-2.) Plaintiffs named Chase, SLS, and Shapiro as defendants. (Id. at 8-9.) Plaintiffs sought a temporary restraining order prohibiting the foreclosure sale of the Property—which was scheduled for the same day—and asserted claims for breach of contract, breach of the covenant of good faith and fair dealing, and violation of the Real Estate Settlement Procedures Act ("RESPA"). (Id. at 14-16.) The Chancery Court denied Plaintiffs' request for a temporary restraining order and set a hearing for June 4, 2016. (Id. at 19.) Accordingly, the foreclosure sale took place on June 2, 2016 as scheduled. Marvin purchased the Property at the foreclosure sale, and Marathon serves as Marvin's property manager or agent. (ECF No. 137-2 at 1633.)

On June 13, 2016, Chase removed Plaintiffs' state court action to this Court. (ECF No. 1.) On July 13, 2016, with leave of the Court, Plaintiffs filed an Amended Complaint asserting claims for (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3) fraud and deceit, (4) violation of RESPA, (5) violation of "escrow waiving" requirements under 15 U.S.C. § 1639, (6) quiet title and to set aside foreclosure, and (7) declaratory judgment. (Id. at 109-13.) Plaintiffs' Amended Complaint also added Marathon, Marvin, and Auction.com, Inc. (the foreclosure auctioneer) as defendants. (See ECF No. 18 at 100-01.)

On May 31, 2017, the Court granted Plaintiffs leave to file a Second Amended Complaint. (ECF No. 91.) Plaintiffs failed to do so within the time allowed, however, and on June 27, 2017, the Court denied Plaintiffs leave to file a late Second Amended Complaint. (See ECF No. 125.)

On August 4, 2017, Chase and SLS filed a Motion for Summary Judgment. (ECF No. 131.) On August 7, 2017, Marathon and Marvin filed a Motion for Summary Judgment, arguing that "to the extent summary judgment is granted to [Chase and SLS], summary judgment should also be granted in favor of Marathon and [Marvin]." (See ECF No. 137-1 at 1630.)

On August 9, 2017, the Court dismissed Plaintiffs' claims for breach of the covenant of good faith and fair dealing, fraud and deceit, violation of RESPA, violation of 15 U.S.C. § 1639, and for quiet title. (See ECF No. 138.) The Court partially dismissed Plaintiffs' claims for breach of contract, preserving only "the claim for breach of the [Deed of Trust] against Chase (¶ 35) on the grounds that the Fords were not in default." (Id. at 1648.) The Court also preserved Plaintiffs' claims to set aside the foreclosure sale and for declaratory judgment because those claims turn on the remaining breach of contract claim. (See id. at 1651.)

On August 24, 2017, the Court stayed trial in this matter pending a ruling on the instant motions for summary judgment. (ECF No. 141.)

## II. LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense." Bruederle v. Louisville Metro Gov't, 687 F.3d 771, 776 (6th Cir. 2012).

"In considering a motion for summary judgment, [the] court construes all reasonable inferences in favor of the nonmoving party." Robertson v. Lucas, 753 F.3d 606, 614 (6th Cir. 2014) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

8

"The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact." Mosholder v. Barnhardt, 679 F.3d 443, 448 (6th Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." Mosholder, 679 F.3d at 448-49; see also Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587. "When the non-moving party fails to make a sufficient showing of an essential element of his case on which he bears the burden of proof, the moving parties are entitled to judgment as a matter of law and summary judgment is proper." Martinez v. Cracker Barrel Old Country Store, Inc., 703 F.3d 911, 914 (6th Cir. 2013) (quoting Chapman v. UAW Local 1005, 670 F.3d 677, 680 (6th Cir. 2012) (en banc)) (internal quotation marks omitted); see also Kalich v. AT & T Mobility, LLC, 679 F.3d 464, 469 (6th Cir. 2012).

In order to "show that a fact is, or is not, genuinely disputed," both parties must do so by "citing to particular parts of materials in the record," "showing that the materials cited do not establish the absence or presence of a genuine dispute," or showing "that an adverse party cannot produce admissible evidence to support the fact." Bruederle, 687 F.3d at 776 (alterations in original) (quoting Fed. R. Civ. P. 56(c)(1)); see also Mosholder, 679 F.3d at 448 ("To support its motion, the moving party may show 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting Celotex, 477 U.S. at 325). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" Martinez, 703 F.3d at 914 (alteration in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "[T]he district court has no 'duty to search the entire record to establish that it is bereft of a

genuine issue of material fact.'" Pharos Capital Partners, L.P. v. Deloitte & Touche, 535 F. App'x 522, 523 (6th Cir. 2013) (per curiam) (quoting Tucker v. Tennessee, 539 F.3d 526, 531 (6th Cir. 2008), abrogation recognized by Anderson v. City of Blue Ash, 798 F.3d 338 (6th Cir. 2015)).

The decisive "question is whether 'the evidence presents a sufficient disagreement to require submission to a [fact finder] or whether it is so one-sided that one party must prevail as a matter of law.'" Johnson v. Memphis Light Gas & Water Div., 777 F.3d 838, 843 (6th Cir. 2015) (quoting Liberty Lobby, 477 U.S. at 251-52). Summary judgment "'shall be entered' against the nonmoving party unless affidavits or other evidence 'set forth specific facts showing that there is a genuine issue for trial.'" Rachells v. Cingular Wireless Employee Services, LLC, No. 1:08CV02815, 2012 WL 3648835, at *2 (N.D. Ohio Aug. 23, 2012) (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 884 (1990)). "[A] mere 'scintilla' of evidence in support of the non-moving party's position is insufficient to defeat summary judgment; rather, the non-moving party must present evidence upon which a reasonable jury could find in her favor." Tingle v. Arbors at Hilliard, 692 F.3d 523, 529 (6th Cir. 2012) (quoting Liberty Lobby, 477 U.S. at 251). "[I]n order to withstand a motion for summary judgment, the party opposing the motion must present 'affirmative evidence' to support his/her position." Mitchell v. Toledo Hosp., 964 F.2d 577, 584 (6th Cir. 1992) (citing Liberty Lobby, 477 U.S. at 247-254; Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)). "[C]onclusory assertions, unsupported by specific facts made in affidavits opposing a motion for summary judgment, are not sufficient to defeat a motion for summary judgment." Rachells, 2012 WL 3648835, at *2 (quoting Thomas v. Christ Hosp. and Med. Ctr., 328 F.3d 890, 894 (7th Cir. 2003)). Statements contained in an affidavit

that are "nothing more than rumors, conclusory allegations and subjective beliefs" are insufficient. See Mitchell, 964 F.2d at 584-85.

## III. DISCUSSION

### A. Breach of Contract

#### 1. Substantive Law

A plaintiff alleging breach of contract is responsible for proving (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of contract. Life Care Centers of America, Inc. v. Charles Town Assocs. Ltd. P'ship, 79 F.3d 496, 514 (6th Cir. 1996). "In 'resolving disputes concerning contract interpretation, [the Court's] task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language.'" Planters Gin Co. v. Fed. Compress & Warehouse Co., 78 S.W.3d 885, 889-90 (Tenn. 2002) (quoting Guiliano v. Cleo, Inc., 995 S.W.2d 88, 95 (Tenn. 1999)). "This determination of the intention of the parties is generally treated as a question of law because the words of the contract are definite and undisputed . . . ." Id. at 890.

"A court's initial task in construing a contract is to determine whether the language of the contract is ambiguous." Id. "Ambiguity, however, does not arise in a contract merely because the parties may differ as to interpretations of certain of its provisions. A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one." Crye-Leike, Inc. v. Carver, 415 S.W.3d 808, 816 (Tenn. Ct. App. 2011). "The court will not use a strained construction of the language to find an ambiguity where none exists." Id.

If the language of the contract is unambiguous, a court "should not go beyond [the document's] four corners to ascertain the parties' intention" because the "literal meaning controls the outcome of the dispute." Adkins v. Bluegrass Estates, Inc., 360 S.W.3d 404, 412 (Tenn. Ct. App. 2011) (internal quotation marks omitted); see also Swanson v. Mid-South Title Ins. Corp., 692 S.W.2d 415, 419 (Tenn. Ct. App. 1984) ("In the absence of fraud or mistake a contract must be interpreted and enforced as written even though it contains terms which may be thought harsh and unjust.").

"Under settled principles of construction, [the] contract must be read as a whole so as to give meaning and effect to all of its provisions." Diversified Energy Inc. v. Tenn. Valley Auth., 223 F.3d 328, 339 (6th Cir. 2000) (quoting Malone & Hyde, Inc. v. United States, 568 F.2d 474, 476 (6th Cir. 1978)). "All provisions in the contract should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract." Guiliano, 995 S.W.2d at 95. "General canons of contract construction require that where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect." Seabury Constr. Corp. v. Jeffrey Chain Corp., 289 F.3d 63, 69 (2d Cir. 2002) (internal quotation marks omitted).

2. **Analysis**

On August 12, 2003, Tasha Ford borrowed $168,550 from Chase pursuant to a Note. (See Note.) Under Section 3 of the Note, Tasha Ford was required to make "monthly payments" of $983.61 to Chase from October 1, 2003 until the loan maturity date of September 1, 2033. (Id. at 978.) Section 6 of the Note provides that: "If I do not pay the full amount of each monthly

12

payment on the date it is due, I will be in default." (Id. at 979.) Section 10 of the Note provides that:

> In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note.

(Id. at 980.)

The same day, Plaintiffs signed a Deed of Trust securing Tasha Ford's loan with the Property. (See DOT.) The Deed of Trust provides that "Borrower and Lender covenant and agree as follows . . . ." (Id. at 985.) Section 1 of the Deed of Trust provides that:

> Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3.
>
> . . .
>
> Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan[6] current. . . . No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument.

(Id. at 985.) Section 3 of the Deed of Trust provides that:

> Borrower shall pay to Lender on the day Periodic Payments[7] are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments . . . ; (c) premiums for any and all insurance required by Lender under Section 5 ["Property Insurance"]; and (d) Mortgage Insurance premiums . . . . These items are called "Escrow Items."
>
> . . .

---

[6] The Deed of Trust defines the "Loan" as "the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest." (DOT at 983.)

[7] The Deed of Trust defines a "Periodic Payment" as "the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument." (DOT at 983.)

13

> Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.
>
> . . .
>
> Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law. . . . Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.
>
> . . .
>
> If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments.

(Id. at 985-86.) Section 22 of the Deed of Trust provides that:

> Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument . . . . The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. . . . If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full or all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

(Id. at 994.)

Therefore, under the Deed of Trust, Tasha Ford was required to make "periodic payments" to Chase in the amount of her "monthly payments" under the Note plus an additional

amount to cover escrow items such as property taxes and property insurance. (See DOT at 983-86.) Chase was required to estimate this additional escrow amount and provide Tasha Ford with an annual accounting of her escrow dues. (See id. at 986.) If Chase's escrow estimates were high and Plaintiffs paid them, a "surplus of Funds held in escrow" would result, and Chase would be required to "account to [Tasha Ford] for the excess funds in accordance with RESPA." (Id.) If Chase's escrow estimates were low—or if Plaintiffs underpaid—a "shortage of Funds held in escrow" would result, and Plaintiffs would be required to "pay to [Chase] the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments." (See id.)

The record does not reflect a factual dispute as to the periodic payment amounts Chase set for Plaintiffs in 2012, 2013, 2014, or 2015. Chase sent several "Annual Escrow Disclosure Statements" to Plaintiffs showing a "Total Payment Amount" of $1,280.19 in 2012; $1,330.90 in 2013; $1,512.11 in 2014; and $1,446.41 in 2015. (See ECF No. 157 at 1892, 1897, 1902.) The periodic payments for 2013, 2014, and 2015 included monthly escrow estimates of $322.33, $347.29, and $421.63, respectively, as well as escrow shortages of $24.96, $127.42, and $41.17, respectively. (See id.) The parties do not dispute that Chase estimated Plaintiffs' escrow dues and shortages in these amounts. (See ECF No. 150-1 at 1763-64.)

Moreover, the record does not reflect a dispute as to the dates and amounts of Plaintiffs' payments to Chase. The "Chase Detailed Transaction History" shows—and the parties do not dispute—that "from May 1, 2013 through the end of 2015, payments were made to Chase in the amount of $1,280.[19] . . . ." (See ECF No. 132-2 at 1006-27; ECF No. 150-1 at 1764.)

Plaintiffs contend that they disputed Chase's escrow estimates in 2013 and 2014.[8] (See ECF No. 150-2 at 1783.) Chase disputes this, contending that "Chase Customer Service Notes show that neither customer called Chase during 2013 or 2014." (ECF No. 158-1 at 1921.) Even assuming that Plaintiffs disputed Chase's escrow estimates in 2013, however,[9] Plaintiffs would not be absolved from making periodic payments in the amounts quoted by Chase unless those amounts were contrary to the Deed of Trust. This is because Plaintiffs' obligation under Section 3 of the Deed of Trust was to make periodic payments to Chase in the amount of Plaintiffs' $983.61 monthly payment under the Note plus an additional amount—estimated by Chase—to cover escrow items such as property taxes and insurance. (See DOT at 986.) Plaintiffs did not owe $983.61 plus their *actual* property taxes and insurance premiums; they owed $983.61 plus Chase's *estimated* property taxes and insurance premiums. Plaintiffs may not have liked this— or even agreed that it was true—but it was nevertheless what the Deed of Trust required because Chase did not waive Plaintiffs' obligation to pay Chase's escrow estimates. (See id.) Unless Chase's escrow estimates were themselves impermissible under the Deed of Trust, Plaintiffs were required to pay them.

The record does not reflect a material factual dispute as to whether Chase's escrow estimates were calculated "on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law." (See DOT at 986.)

---

[8] Plaintiffs also contend that they had similar disputes with Chase in 2009 and 2012, and that in those earlier disputes, "Chase acknowledged their mistake" and corrected Plaintiffs' escrow account. (See ECF No. 150-2 at 1780-82.) There is no evidence in the record that these past "corrections" were anything more than accommodations. Moreover, even if Chase had incorrectly estimated escrow dues in the past, Chase's 2013 and 2014 estimates would not be presumptively incorrect.

[9] At the summary judgment stage, the Court "construes all reasonable inferences in favor of [Plaintiffs]." See Robertson, 753 F.3d at 614 (citing Matsushita, 475 U.S. at 587).

Plaintiffs contend that, in 2013, Chase "did not use current data for the reduced County Tax amount," in contravention of the Deed of Trust. (See ECF No. 150-2 at 1782.) This argument appears to misread the Deed of Trust to require Chase's escrow estimates to be proven accurate in order for Plaintiffs to owe payments in the estimated amounts. As discussed earlier, that does not reflect the terms of the parties' agreement. Chase was permitted to use the current year's tax and insurance data to estimate the next year's taxes and insurance, and Plaintiffs were required to pay Chase's estimates even if Plaintiffs' actual tax and insurance amounts diverged from Chase's estimates. The record does not appear to include any evidence that Chase used non-current data in its calculations,[10] and, as Chase argues, "Plaintiffs fail to explain how exactly they think the escrow payments should have been calculated annually, or why (or even if) the payments calculated by Chase were in excess of those permitted by RESPA." (See ECF No. 158 at 1907.)

The record therefore shows that Chase provided Plaintiffs with escrow estimates that were permissible under the Deed of Trust. Plaintiffs, however, failed to "pay to [Chase] the amount necessary to make up the shortage . . . in no more than 12 monthly payments." (See DOT at 986.) Plaintiffs thus defaulted on their obligation to "pay when due the principal of, and interest on, the debt evidenced by the Note" and to "also pay funds for Escrow Items pursuant to Section 3." (See id. at 985.)

Pointing to the definition of "Default" in Section 6 of the Note, Plaintiffs argue that the only "default" that can trigger foreclosure is the failure to pay the monthly payments of principal and interest required under the Note. (See ECF No. 150 at 1742; see also Note at 979.) The phrase "the default" in Section 22 of the Deed of Trust, however, is not a reference to the phrase

---

[10] "[T]he district court has no 'duty to search the entire record to establish that it is bereft of a genuine issue of material fact.'" Pharos Capital Partners, 535 F. App'x at 523.

17

"in default" in Section 6 of the Note. (See Note at 979; DOT at 994.) Instead, "the default" discussed in Section 22 of the Deed of Trust is the failure to make the payments required under the "Loan"—defined in the Deed of Trust as "the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest." (See DOT at 983. This was precisely the "breach of any covenant or agreement" that triggered acceleration of Plaintiffs' loan under Section 22 of the Deed of Trust.[11] (See DOT at 994.) The Note and the Deed of Trust "must be read as a whole so as to give meaning and effect to all of [their] provisions." See Diversified Energy, 223 F.3d at 339. Contrary to Plaintiffs' reading of the loan documents, defaulting under the Note is not the only way to default.

Therefore, under Section 22 of the Deed of Trust, Chase was permitted to accelerate Plaintiffs' loan after giving them proper notice. (See id. at 994.) The "Acceleration Warning" letter Chase sent to Tasha Ford on September 29, 2015 stated that the total amount "past due" under the terms of her loan documents was $10,880.30, including "Total Monthly Payments" of $8,744.16, "Late Fees" of $904.82, and "Advances" of $1,962.96. (ECF No. 132-3 at 1125.) The letter specified that, under the terms of the Deed of Trust securing her loan, (1) Tasha Ford was in "default" because she had failed to pay several monthly installments, (2) in order "to cure the default," Tasha Ford needed to "pay the Total Monthly Payments" amount of $8,744.16, and (3) if Tasha Ford failed to cure the default by November 3, 2015, "Chase may accelerate the

---

[11] Section 22 of the Deed of Trust requires Chase to provide Plaintiffs with notice specifying "the default" and how to cure it so as to avoid acceleration. (See DOT at 994.) The immediately preceding sentence requires Chase to notify Plaintiffs "prior to acceleration following [Plaintiffs'] breach of any covenant or agreement" in the Deed of Trust. (See id.) Therefore, "the natural, and ordinary meaning of the contractual language" is that "the default" refers to the "breach of any covenant or agreement" mentioned in the preceding sentence. See Planters Gin Co., 78 S.W.3d 885, 889-90.

18

maturity of the Loan, declare all sums secured by the Security Instrument immediately due and payable, and commence foreclosure proceedings, all without further notice to [Tasha Ford]." (Id. at 1125-26.) Accordingly, Chase provided Plaintiffs with proper notice of acceleration under Section 22 of the Deed of Trust. (See DOT at 994.)

Plaintiffs, however, did not make a payment to Chase in the amount of at least $8,744.16 by November 3, 2015. Instead, on December 10, 2015, Kelvin Ford sent a letter to Shapiro, enclosing a check for $1,244.35 as well as three previously-returned checks for $1,280.19. (See ECF No. 150-6.) This attempted payment of $5,084.92 was insufficient to cure Plaintiffs' default, and consequently, Chase was entitled to "invoke the power of sale" and "collect all expenses incurred in pursuing the remedies provided in [Section 22 of the Deed of Trust], including, but not limited to, reasonable attorneys' fees and costs of title evidence." (See DOT at 994.) Chase was therefore within its rights to initiate foreclosure proceedings.

For these reasons, the evidence in the record does not "present[] a sufficient disagreement to require submission to a jury . . . ." See Liberty Lobby, 477 U.S. at 251-52. No reasonable jury could find for Plaintiffs on their claim that "Chase's initiation of foreclosure proceedings . . . constitutes breach of the terms and conditions of the [Deed of Trust] because the Fords made the required monthly payments of the [Deed of Trust] on time or early each and every month." (See ECF No. 18 at 107, ¶ 35.) Accordingly, Chase and SLS's Motion for Summary Judgment is GRANTED as to Plaintiffs' remaining breach of contract claim (Count 1).

B. **Declaratory Judgment & Setting Aside Foreclosure Sale**

The Court preserved Plaintiffs' claims to set aside the foreclosure sale and for declaratory judgment because those claims turned on Plaintiffs' breach of contract claim.[12] Summary judgment has now been granted in favor of Chase and SLS on the breach of contract claim. Therefore, there is no genuine dispute as to the validity of the June 2, 2016 foreclosure sale. Accordingly, Chase and SLS's Motion for Summary Judgment is GRANTED as to Plaintiffs' claims to set aside the foreclosure sale (Count 6) and for declaratory judgment (Count 7). Marathon and Marvin's Motion for Summary Judgment is also GRANTED as to as to Plaintiffs' claims to set aside the foreclosure sale (Count 6) and for declaratory judgment (Count 7).

IV. **CONCLUSION**

For the foregoing reasons, both instant motions for summary judgment are GRANTED. Specifically, Chase and SLS's Motion for Summary Judgment is GRANTED as to Plaintiffs' remaining breach of contract claim (Count 1). Chase and SLS's Motion for Summary Judgment is GRANTED as to Plaintiffs' claims to set aside the foreclosure sale (Count 6) and for declaratory judgment (Count 7). Marathon and Marvin's Motion for Summary Judgment is GRANTED as to as to Plaintiffs' claims to set aside the foreclosure sale (Count 6) and for declaratory judgment (Count 7).

**IT IS SO ORDERED**, this 5th day of March, 2018.

/s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE

---

[12] Had Plaintiffs paid Chase's escrow estimates and *then* brought legal action against Chase, only dollars—not ownership of the Property—would be at stake in this action. Instead, Plaintiffs effectively bet the Property on their interpretation of the Deed of Trust.